715 So.2d 1181 (1998)
Ronald BANKSTON and Lounges, Inc.
v.
BOARD OF ETHICS FOR ELECTED OFFICIALS.
No. 98-C-0189.
Supreme Court of Louisiana.
June 22, 1998.
Order on Rehearing September 4, 1998.
R. Gray Sexton, Maris LeBlanc McCrory, Baton Rouge, Kathleen Marie Allen, Lafayette, for Applicant.
Thomas Robert Peak, Taylor, Porter, Brooks & Phillips, Baton Rouge, for Respondent.
CALOGERO, Chief Justice.[*]
With the primary objective of preventing public officers and employees from becoming involved in conflict of interest situations, the Code of Governmental Ethics prohibits a public servant from engaging in certain conduct *1182 with "persons," defined in the code, with whom the public servant is affiliated, which would possibly bring such conflicts into being. See generally LSA-R.S. 42:1112 C(2)(d) (West 1990); LSA-R.S. 42:1112 B(3) & (5) (West 1990); Glazer v. Commission on Ethics for Public Employees, 431 So.2d 752, 756 (La.1983). While in the instant case the Board of Ethics for Elected Officials found a violation of the code, the court of appeal did not, for the reason that the defendant's employer, Quad Area Community Action Agency, was not a "person" but rather a governmental agency to which that provision of the law does not apply. We granted certiorari in this case to determine whether the court of appeal was correct in finding that Quad Area Community Action Agency is not a "person" as defined by the Code of Governmental Ethics. For the following reasons, we reverse that finding of the court of appeal.

FACTS AND PROCEDURAL HISTORY
The pertinent facts of this case have been stipulated and are as follows. On May 17, 1976, Quad Area Community Action Agency, Inc. ("Quad Area") was created as a non-profit corporation for the stated purpose of mobilizing "community resources to combat poverty ... which includes initiating housing and employment opportunities." From approximately August 12, 1980 through July 10, 1984, the Tangipahoa Parish Council designated Quad Area as its official community action agency. By virtue of that designation, Quad Area received parish funds as well as the parish's designation to receive state and federal funds for community action development.
Ronald Bankston, the defendant in this case, served as an elected member of the Tangipahoa Parish Council from June of 1980 until December of 1982. On December 3, 1984, Bankston was hired by Quad Area to be the Tangipahoa Parish Coordinator. He remained employed by Quad Area through February 22, 1996, the date of the hearing before the Board of Ethics. He drew a salary of $6,500.01 per quarter.[1] Bankston, off the Council after 1982, ran again and was re-elected to the Tangipahoa Parish Council, beginning a new term on January 1, 1992. During the time between 1984 and 1992, although Quad Area remained designated as the parish community action agency, it had received no parish funding.[2] On January 14, 1992, Quad Area was again designated as the official community action agency for Tangipahoa Parish by the parish council. Bankston abstained from that vote. On April 27, 1992, the Tangipahoa Parish Council again designated Quad Area as the official community action agency for the parish. Bankston did participate in this vote.
On January 27, 1992, the Tangipahoa Parish Council adopted its capital outlay budget which included a $15,000 appropriation for Quad Area. Bankston did vote on this matter, and the resolution passed unopposed. This was the first time after 1982 that the parish had funded Quad Area. During November of 1992, 1993, and 1994, the Tangipahoa Parish Council adopted its operating and capital outlay budget for the following year, which included a line item of $15,000 to fund Quad Area. Bankston voted for the adoption of these budgets and all passed unopposed.
On August 29, 1988, Bankston and Dr. Melvin Allen created Lounges, Inc., a corporation in which each owned a fifty percent interest. At that time, Quad Area had been renting office space in three buildings in Hammond. Sometime thereafter, the buildings which Quad Area occupied were repossessed by Central Progressive Bank following bankruptcy proceedings. On May 11, 1990, Lounges, Inc. purchased the buildings, which at that time were subject to an existing lease with Quad Area. For the years 1990 through 1994, Lounges, Inc. and Quad Area executed annual leases for the buildings. Beginning October 1, 1992 Quad Area paid *1183 $2,050 per month in rent,[3] with an annual rental rate of approximately $2 per square foot. This was an attractive rate as far as Quad Area was concerned, for the going rate for rental space in that area was purportedly $5 to $10 per square foot. In 1995, Quad Area extended its lease and continued to rent from Lounges, Inc. at the time of the ethics hearing. On December 14, 1995, Bankston executed a stock certificate endorsement transferring his shares in Lounges, Inc., to Dr. Allen.
In February of 1996, the Board of Ethics for Elected Officials convened to investigate the following charges leveled against Bankston and Lounges, Inc.:
1.
That Ronald Bankston, a member of the Tangipahoa Parish Council, violated Section 1111C(2)(d)of the Code of Governmental Ethics (La. R.S. 42:1111C(2)(d))[4] by having rendered compensated services to Quad Area Community Action Agency, Inc. ("Quad Area") from January 1992 to the present time while Quad Area had a financial relationship with Tangipahoa Parish.
2.
That Ronald Bankston violated Section 1111E of the Code of Governmental Ethics (La. R.S. 42:1111E(1))[5] by assisting Quad Area, in his capacity as its "Tangipahoa Parish Coordinator," in transactions with the Tangipahoa Parish Council.

3.
That Ronald Bankston violated Sections 1112B(3) and/or 1112B(5) of the Code of Governmental Ethics (La. R.S. 42:1112B(3) and/or 1112B(5))[6] by having participated in Tangipahoa Parish Council transactions in which, to his knowledge, Quad Area had a substantial economic interest, including, but not limited to, his participation in the following votes: (1) 1/27/92 vote to approve the 1992 budget for the parish which included a $15,000 grant to Quad Area; (2) 4/27/92 vote to designate Quad Area as the official community action agency for Tangipahoa Parish; (3) 11/23/92 vote for the 1993 parish budget including a $15,000 *1184 grant to Quad Area; (4) 11/22/93 vote for the 1994 parish budget including a $15,000 grant to Quad Area; and (5) 11/14/94 vote for the 1995 parish budget including a $15, 000 grant to Quad Area.
4.
That Lounges, Inc., a legal entity in which Ronald Bankston, a member of the Tangipahoa Parish Council, owns in excess of 25%, violated Section 1111C(2)(d) of the Code of Governmental Ethics (La. R.S. 42:1111(C)(2)(d)) by having leased immovable property to Quad Area Action Agency, Inc. ("Quad Area") at a time when Quad Area had a financial relationship with the Tangipahoa Parish Council by virtue of its receipt of annual $15,000 grants.
The Board later determined that Bankston and Lounges, Inc. had violated Section 1111 C(2)(d) of the ethics code. Bankston was additionally found in violation of Sections 1112 B(3) and 1112 B(5) of the ethics code. The Board found that there was insufficient evidence to find Bankston in violation of Section 1111 E(1).
The court of appeal reversed. Ronald Bankston & Lounges, Inc. v. Board of Ethics for Elected Officials, No. 96-1764 (La.App. 1st Cir. 11/7/97), 703 So.2d 703. It concluded that Quad Area was a governmental agency for purposes of the Code of Governmental Ethics, and thus, it could not be a "person" as defined therein. Consequently, Bankston and Lounges, Inc. could not be found to have violated any sections of the code with which they were charged. We granted writs to review the correctness of this decision. Ronald Bankston & Lounges, Inc. v. Board of Ethics for Elected Officials, No. 98-C-0189 (La.3/27/98).

LEGAL ANALYSIS
Section 1102(16) of the code defines a "person" as "an individual or legal entity other than a governmental entity, or an agency thereof." LSA-RS 42:1102 (West 1990) (emphasis added). The court of appeal concluded that Quad Area was a governmental agency, and therefore, it did not meet the definition of a "person" as defined by the code of ethics. The court of appeal's holding was based on the premise that community action agencies are legislatively created entities by virtue of Louisiana's laws on the administration of community action agencies, LSA-RS 23:61 et seq. Citing this Court's decision in Mullins v. State, 387 So.2d 1151 (La.1980), the court of appeal reasoned that their status as creatures of the Legislature mandates that community action agencies be classified as state agencies. As an agency of the state, the state being classified by the code as a "governmental entity,"[7] the court of appeal concluded that Quad Area is a governmental agency and therefore expressly excluded from the definition of "person" in the ethics codes. In this Court, the Board urges that the court of appeal erred in its conclusion that Quad Area is a public, governmental agency and, contrarily, asserts that Quad Area is a private, nonprofit corporation properly classified as a "person" under the ethics code. We agree, and for the following reasons, reverse the court of appeal.
In State v. Smith, 357 So.2d 505 (La.1978), this Court was called upon to determine whether Community Advancement, Inc., a community action agency, was a state, or public, agency. This Court identified several factors that should be used in determining whether or not an entity should be so classified. Those factors were the following: (1) the entity was created by the Legislature; (2) the powers were specifically defined by the Legislature; (3) the property of the entity belonged to the public; and (4) the entity's functions were exclusively of a public character and performed solely for the public benefit. Smith, 357 So.2d at 507.
In Smith, we noted that a continuing theme running through the jurisprudence which had previously addressed this issue was that entities which were classified as state agencies were either created by the Legislature or established by the Constitution. *1185 Id. Consequently, in Smith, we declined to hold that Community Advancement, Inc. was a state agency for the reason that it was not legislatively created. In reaching this conclusion, we noted that Community Advancement, Inc. had not been established by some special act of the Legislature, but rather that it was established by corporate charter in compliance with general state corporations law. Moreover, we noted that the federal Economic Opportunity Act, which authorized federal financial assistance for community action programs, contemplated that a private nonprofit agency could be a community action agency as defined in the federal statute.[8] We additionally found that Community Advancement, Inc.'s relationship with East Baton Rouge Parish, by which it was designated a community action agency, was contractual, and that the flow through of public funds was not enough to transform Community Advancement, Inc. into a public agency.
Under the same reasoning we employed in Smith, we find that Quad Area likewise is not a public, or state, agency.[9] As was stipulated to by the parties, Quad Area was created on May 17, 1976, as a private, nonprofit corporation under the provisions of Title 12 of the Revised Statutes. Its creation preceded its designation as the official community action agency of Tangipahoa Parish by approximately four years. Like the community action agency at issue in Smith, Quad Area's articles of incorporation demonstrate its intent to avail itself of the Economic Opportunity Act,[10] which, as we have previously noted, contemplated that private, nonprofit corporations can indeed carry out the functions of a community action agency. Quad Area was not created by special act of the Legislature or by the Constitution but was created by corporate charter and contemplated existence as a private, nonprofit corporation.
The enactment in 1982 of the community action legislation found at LSA-RS 23:61 et seq. did not transform Quad Area into a creature of the Legislature. The stated purpose of that legislation was simply to "establish a procedure for the designation of community action agencies, [to fix] the responsibilities of community action agencies; [to define] community action programs; and [to establish] a formula for the allocation of community service block grant funds." LSA-RS 23:61 (West 1985). This purpose is to be carried out by "public [] or private nonprofit corporation[s] having authority under [their] charter[s] or bylaws, or both, to administer community action programs, *1186 which have been designated as [] community action agenc[ies] by the parish governing authority." LSA-RS 23:62(1) (West 1985). Significantly, Section 64.1(E) provides that "[a]n entity designated as a community action agency shall be considered a private, nonprofit organization unless it establishes otherwise by October 1, 1994 or upon its initial designation if such occurs after such date." LSA-RS 23:64.1 (West Supp.1998). Quad Area's initial designation occurred before October 1, 1994, and it has not "established otherwise" that it is not a private, nonprofit organization. Therefore, it is to be considered private. Quad Area is simply not a creature of the legislation or of the Constitution. The court of appeal erred in its holding.
The court of appeal further opined that even if it chose to recognize the private nature of Quad Area, this factor itself would not prevent a designation of that agency as public or quasi-public for specific purposes, i.e. for purposes of the ethics code. In support of this proposition, the court of appeal cited this Court's decision in State ex rel. Guste v. Nicholls College Foundation, 564 So.2d 682 (La.1990). Our decision in Guste is distinguishable from the instant case, however. Guste required this Court to determine whether the Nicholls State University Alumni Federation was a "public body" within the context of the Public Records Act, LSA-RS 44:1 et seq. Within the Act, "public body" was specifically defined to include "a public or quasi-public nonprofit corporation designated as an entity to perform a governmental or proprietary function." Guste, 564 So.2d at 685 (quoting LSA-RS 44:1(A)(1) (emphasis added)). This Court concluded that the Alumni Federation was a "public body" for purposes of the Public Records Act because its close relationship with Nicholls State rendered it "quasi-public." Id. at 687. To the contrary, the Code of Governmental Ethics makes no mention of quasi-public entities and does not provide for the treatment of quasi-public entities within its ambit. We decline to insert judicially into the code this new classification. The rules of statutory construction require that the unambiguous letter of the law should not be disregarded under the pretext of pursuing its spirit. La. Civ. Code Ann. art. 9 (West 1993).
Thus, for the purposes of LSA-R.S. 42:1111 C(2)(d), Quad Area is a "person"from whom Bankston and Lounges, Inc. received a "thing of economic value for or in consideration of services rendered." Furthermore, for the purposes of LSA-R.S. 42:1112 B(3) and LSA-R.S. 42:1112 B(5), Quad Area is a "person" for whom Bankston is an employee and is a "person" which was "party to an existing contract with a legal entity in which [Bankston] own[ed] an interest in excess of 25%." Quad Area is not a governmental entity or agency thereof, a designation that the statute specifically excludes from its definition of a "person."
Bankston urges in this Court that even if we find Quad Area to be a "person" within the meaning of the ethics code, that he is not in violation of Section 1111 C(2)(d) because Quad Area did not have a "contractual or other business or financial relationship" with Tangipahoa Parish, and that he is not in violation of Section 1112 B(3) & (5) because Quad Area did not have a "substantial economic interest" in the transactions with the parish council in which he was a participant. We find both of these arguments to be without merit.
Section 1111C(2)(d) prohibits, for purposes of the instant case, a public servant and a legal entity in which the public servant has a twenty-five percent interest from receiving any thing of economic value for services rendered to a person from whom the ethics code would prohibit the public servant's receipt of a gift. Section 1115(A)(1) prohibits the public servant from receiving a gift from a person who "has or is seeking to obtain contractual or other business or financial relationships with the public servant's agency." Bankston argues that Quad Area did not have a "contractual or financial or business" relationship with Tangipahoa Parish because the relationship between the parish and Quad Area was one of donor and donee with respect to the $15,000 annual appropriation of parish funds and because Bankston did not benefit personally from Quad Area's receipt of these funds.
*1187 We find that Quad Area had both a contractual and a financial relationship with Tangipahoa Parish. First, the relationship between the parish and Quad Area was indeed financial if for no more than that Quad Area received money, or "finances," from the parish on a yearly basis. Second, we find that there was indeed a contractual relationship between Quad Area and Tangipahoa Parish. We have previously classified the nature of a community action agency's relationship with its designating parish as contractual. Smith, supra, 357 So.2d at 508 ("The relationship CAI had with the East Baton Rouge government was one of contract."). Furthermore, we note that the fact that neither Bankston nor Lounges, Inc. received a personal benefit is of no relevance in determining whether or not there has been an ethical violation under the code. The standards set forth in the code of ethics are objective rather than subjective. The use of objective standards furthers the code's purpose of protecting against both actual and perceived conflicts of interest. In re Beychok, 495 So.2d 1278 (La.1986). Thus, these standards do not require that there be actual wrongdoing on the part of the public servant. Id. at 1283. Whether Bankston or Lounges, Inc. in fact received a personal benefit does not cure the appearance of impropriety, which the code was enacted to guard against. Consequently, we find that Quad Area did have a "contractual or other business or financial relationship" with Tangipahoa Parish and Bankston was therefore in violation of Section 1111 C(2)(d) of the ethics code.
We also find that Quad Area had a "substantial economic interest" in the transactions with Tangipahoa Parish in which Bankston was a participant. Section 1102(21) of the code of ethics defines "substantial economic interest" in pertinent part as "an economic interest which is of greater benefit to the public servant or other person than to a general class or group of persons...." Bankston argues that Quad Area's interest was not substantial because the $15, 000 appropriation it received from Tangipahoa Parish was just a minute amount of its approximate annual budget of between four and five million dollars. Furthermore, Bankston argues that these transactions did not put Quad Area in a position to directly affect the economic interest of Bankston, and that the donation of the funds was of greater benefit to a general class of persons, here the poor, than to either Quad Area or Bankston.
First we note that under Section 1112, it is not the public servant who is required to have the "substantial economic interest." Rather it is the "person" by whom he is employed or with whom he, or a legal entity in which he has a twenty-five percent interest, is party to an existing contract, who must have the requisite economic interest for there to be an ethical violation. Thus, the fact that Bankston personally had no "substantial economic interest" in the transactions involving Tangipahoa Parish is of no moment. Second, under the objective standards of the ethics code previously discussed, it is improper to look at the annual budget of Quad Area or how Quad Area decided to use the funding that it received in order to determine whether or not it had a "substantial economic interest." Finally, the "general class or group of persons" is not, as Bankston argues, the poor of Tangipahoa Parish, but rather the general class of all nonprofit corporations concerned with community service. The $15,000 appropriation from Tangipahoa Parish was not of greater benefit to the general class of nonprofit organizations than it was to Quad Area. The money was given directly to Quad Area for use in the parish as Quad Area saw fit. Therefore, we find Bankston's assertion that he is not in violation of Section 1112 B(3) & (5) because Quad Area did not have the requisite "substantial economic interest" to be without merit.

CONCLUSION
For the foregoing reasons, we conclude that Quad Area is a "person" as defined by the ethics code. Quad Area is not a legislative creation nor are its powers derived from the Legislature. It has not acted to alter its status as a private, nonprofit organization. As such, LSA-RS 23:64.1(E) states that it is to be considered a private organization. For these reasons, it is not a governmental agency under the Code of Governmental Ethics, and the court of appeal was in error in *1188 holding to the contrary. We further conclude that Quad Area did have a "contractual or other business or financial" relationship with Tangipahoa Parish under LSA-R.S. 42:1111 C(2)(d), and that it had a "substantial economic interest" in Bankston's transactions with the parish under LSA-R.S. 42:1112 B(3) & (5). Therefore, we find the defendant's conduct to be in violation of the code of ethics. For the aforementioned reasons, we reverse the court of appeal decision and reinstate the decision of the Board of Ethics for Governmental Officials.

DECREE
REVERSED; THE DECISION OF THE BOARD OF ETHICS IS REINSTATED.
PER CURIAM.
Rehearing granted in part; otherwise denied. The matter is remanded to the Court of Appeal, First Circuit, for further proceedings consistent with the opinion of this Court. Applicants raised other issues in the Court of Appeal that were not addressed by that court and which remain pending. Rehearing is denied in all other respects.
KNOLL, J., not on panel.
NOTES
[*] Knoll, J. not on panel. See Rule IV, Part 2, § 3.
[1] Bankston was on sick leave from approximately late 1995 until the date of the hearing but continued to draw his salary of $6,500.01 per quarter.
[2] The record reflects that the parish was financially unable to fund Quad Area during this period of time. The passage of a sales tax sometime around 1990 apparently afforded the parish enough income to allow it to resume funding to Quad Area in 1992, the year that Bankston was re-elected to the council.
[3] Before October of 1992, the rent had been $,1750 per month.
[4] LSA-R.S. 42:1111 C(2)(d)(West 1990) reads:

(2) No public servant and no legal entity in which the public servant exercises control or owns an interest in excess of twenty-five percent, shall receive any thing of economic value for or in consideration of services rendered ... to or for any person during his public service unless such services are:
(d) Neither performed for nor compensated by any person from whom such public servant would be prohibited by R.S. 42:1115 A(1) ... from receiving a gift.
LSA-R.S. 42:1115 A(1) reads:
A. No public servant shall solicit or accept, directly or indirectly, any thing of economic value as a gift or gratuity from any person or from any officer, director, agent, or employee of such person, if such public servant knows or reasonably should know that such person:
(1) Has or is seeking to obtain contractual or other business or financial relationships with the public servant's agency.
LSA-R.S. 42:1115 (West 1990).
[5] LSA-R.S. 42:1111 E(1) reads:

(1) No public servant, and no legal entity of which such public servant is an officer, director, trustee, partner, or employee, or in which such public servant has a substantial economic interest, shall receive or agree to receive any thing of economic value for assisting a person in a transaction, or in an appearance in connection with a transaction, with the agency of such public servant.
LSA-R.S. 42:1111 (West 1990).
[6] LSA-R.S. 42:1112 B(3) & (5) read:

B. No public servant, except as provided in R.S. 42:1120, shall participate in a transaction involving the governmental entity in which, to his actual knowledge, any of the following persons has a substantial economic interest:
(3) Any person of which he is an officer, director, trustee, partner, or employee.
(5) Any person who is a party to an existing contract with such public servant, or with any legal entity in which the public servant exercises control or owns an interest in excess of twenty-five percent, or who owes any thing of economic value to such public servant, or to any legal entity in which the public servant exercises control or owns an interest in excess of twenty-five percent, and who by reason thereof is in a position to affect directly the economic interests of such public servant.
LSA-R.S. 42:1115 (West 1990).
[7] Section 1102(12) of the code defines "governmental entity" as "the state or any political subdivision which employs the public employee or employed the former public employee or to which the elected official is elected, as the case may be." LSA-R.S. 42:1102 (West 1990).
[8] The Economic Opportunity Act, formerly found at 42 U.S.C. § 2781 et seq., was repealed effective October 1, 1981, and the appropriation of funding for community action agencies is now governed by the Community Services Block Grants Act currently found at 42 U.S.C.A. § 9901 et seq. See 42 U.S.C.A. § 9912(a) (West 1995). Prior to its repeal, section 2790(a) of the Economic Opportunity Act stated, "A community action agency shall be ... a public or nonprofit agency or organization which has been designated by a State or [] a political subdivision...." According to the new legislation, "[a]ny reference in any provision of law to any community action agency designated under title II of the Economic Opportunity Act of 1964 [42 U.S.C.A. § 2781 et seq.] shall be construed to be a reference to private nonprofit community organizations eligible to receive funds under this chapter." 42 U.S.C.A. § 9912(c)(2) (West 1995).
[9] Although Smith required us to examine whether the community action agency at issue was a state agency for purposes of a criminal statute, which necessarily requires us to strictly construe all terms found therein, we nonetheless find the analysis used in Smith to be applicable in the instant case although the pertinent statutes here are not penal. The determination of whether an entity is properly classified as a state agency is distinct from the question of whether a particular statute intended for such agencies to fall within its ambit. Interestingly, although certainly not controlling, we note that the Attorney General has issued an opinion in which he determined, based on our holding in Smith, supra, that Quad Area was not created by the local or state government and therefore "does not constitute an agency, board, commission, or instrumentality of the state or its political subdivisions." Rather it merely operates pursuant to the community action legislation, LSA-R.S. 23:61 et seq. La. Atty. Gen. Op. No. 97-69 (1997).
[10] Article II(25) states that one of the objects and purposes for which Quad Area was organized was "[t]o receive grants from the United States Government and to conduct any and all projects authorized by the Economic Opportunity Act of 1964, Public Law 88-452, and to that extent, to participate in and to do any and everything that may be required to function under the requirements of said law."