# In re Honorable Althea P. Kroger

[702 A.2d 64]

No. 96-495

**Present: Johnson, J., and Hudson, DiMauro and Skoglund, D. JJ., and Dier, Supr. J. (Ret.), Specially Assigned**

Opinion Filed July 25, 1997

2

*David A. Otterman* of *Otterman and Allen, P.C.*, Barre, for Judicial Conduct Board.

*James W. Runcie* of *Ouimette & Runcie*, Vergennes, for Respondent.

**Per Curiam.** Respondent is charged with violating Canons 1 and 2A of the Code of Judicial Conduct. A four-member majority of the Judicial Conduct Board found that certain public statements made by respondent were false, deceptive, and/or misleading, and concluded that respondent should be disciplined for violating the Code. The Board could not recommend a sanction because five members did not concur, as required by our rules. Rules of Supreme Court for Disciplinary Control of Judges, Rule 6(17). Respondent argues that the Board's findings are erroneous, and urges this Court to dismiss the charges against her. We conclude that some of the statements made by respondent violated the Code and accordingly sanction respondent by suspending her from serving in a judicial capacity for one year.

## I. Factual Background

Respondent was elected as an assistant judge for Chittenden County in November 1994 and took office in February 1995. Shortly after she took office, she and incumbent Assistant Judge Elizabeth Gretkowski became embroiled in conflicts over the administration of county business. These disputes were reported by the press, and respondent felt that the press coverage was biased against her. In August 1995, respondent decided to express her views on the management of the county budget by writing an article in the Burlington Free Press. The article, published in the newspaper's "It's My Turn" column, discussed a number of financial issues and also mentioned respondent's concern that she was not permitted to audiotape assistant judge meetings or to take notes at those meetings. Chittenden County Clerk Diane Lavallee drafted a response to this article, which was later published under Judge Gretkowski's name.

At the same time that respondent sent her article to the Free Press, she filed a complaint against Judge Gretkowski with the Judicial

4

Conduct Board. Respondent attached a copy of the article to the complaint. A short time later, respondent sent another letter to the Board, along with a memorandum entitled "Documentation in Support of Complaint Against Assistant Judge Elizabeth Gretkowski." In the memorandum, respondent alleged that Judge Gretkowski had violated various provisions of the Code of Judicial Conduct by failing to comply with the Open Meeting Law; allocating capital construction funds in a manner prohibited by statute; failing to respond to the judicial and administrative problems in Chittenden County, specifically by refusing to enter mediation; and acting discourteously and in an undignified manner to litigants, witnesses, lawyers, and court personnel.

█ The Vermont Association of County Judges (VACJ) became increasingly concerned about this unpleasant and very public dispute between respondent and Judge Gretkowski. The organization decided to hold hearings about the allegations in the two newspaper articles and about the working relationship between the two judges. Although VACJ has no statutory or other authority to hold such hearings, both respondent and Gretkowski elected to participate. The procedural rules for the hearings, held in October 1995, allowed each judge to testify, call witnesses, and present documentary evidence, but did not permit cross-examination. The witnesses were sworn and a record was made of their testimony. The present charges against respondent are based on statements that she made while testifying at the VACJ hearings.[1]

---

[1] To the extent the "allegations" addressed at the VACJ hearings amounted to charges of judicial misconduct, evaluation of the charges was the exclusive province of the Judicial Conduct Board, as established by the rules of this Court. VACJ has no authority to hear such charges or to discipline assistant judges, and should not have acted independently of our procedures for investigating judicial misconduct. As best we can determine, the hearings served no constructive purpose and merely provided the two judges with another public forum in which to air their disputes. We share the concerns of one of the dissenting Board members that participation in these unauthorized public hearings, and particularly using the hearings to raise questions about the integrity of a fellow judge, may have violated the Code of Judicial Conduct. See A.O. 10, Canon 4(A)(2) ("A judge shall conduct all of the judge's extra-judicial activities so that they do not . . . demean the judicial office."); id. Canon 4(C)(1) (judge "shall not appear at a public hearing before . . . an executive or legislative body or official except on matters concerning the law, the legal system or the administration of justice or except when acting pro se in a matter involving the judge or the judge's interests.").

Our conclusion that these hearings should not have taken place is underscored by these judicial conduct proceedings against respondent. The peculiar circumstances in which respondent made these statements prompted sharp disagreement among the members of the Judicial Conduct Board. Although four members of the Board agreed

## II. Legal Standards

In a judicial conduct proceeding, this Court makes the only final and ultimate decision. *In re Bryan*, 164 Vt. 589, 593, 674 A.2d 793, 796 (1996). The findings made by the Board in this matter "carry great weight, but are advisory, not binding." *Id.* We are obliged to review and evaluate the evidence independently to determine if the charges against respondent are supported by clear and convincing evidence. See *id.* at 595, 674 A.2d at 797 (misconduct must be proven by clear and convincing evidence).

Respondent maintains that the complaint against her should be dismissed because only four members of the Board endorsed the findings. Our rules do not support this argument. Although five members of the Board must concur in a recommendation for sanction, the rules do not require five members to concur in the findings. Rules of Supreme Court for Disciplinary Control of Judges, Rule 6(17). Moreover, the rules specifically require the Board to transmit its findings to this Court without a recommendation if five members cannot agree on a recommended sanction. *Id.* As any findings made by the Board are merely advisory, we see no reason to require more than a simple majority of Board members to endorse the findings. That several Board members dissented from certain critical findings may, of course, be a factor that the Court considers in evaluating whether the charges against respondent have been proven by clear and convincing evidence.

The ultimate question in this matter is whether respondent violated the Code of Judicial Conduct. The complaint alleges that respondent violated Canons 1 and 2(A) by making "false, deceptive and misleading statements under oath" during the VACJ hearings. Canon 1 states:

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and *shall* personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code are to be construed and applied to further that objective.

---

that respondent had made false, deceptive, and misleading statements at the hearings, two members wrote dissents and a third dissented without opinion. The dissenters emphasized the political nature of both the dispute between the judges and the comments made at the hearings. One suggested, with some merit, that the judicial conduct proceeding was being misused to break a political deadlock between two elected officials.

6

A.O. 10, Canon 1 (emphasis added). Canon 2(A) provides that "[a] judge *shall* respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." A.O. 10, Canon 2(A) (emphasis added). Both of these canons establish mandatory standards, the violation of which may lead to disciplinary proceedings. See A.O. 10, Preamble to the Code of Judicial Conduct (2) ("When the text uses 'shall' or 'shall not,' it is intended to impose binding obligations the violation of which can result in disciplinary action.").

Respondent maintains that she may be disciplined for violating these canons only if she intentionally made false or deceptive statements. She argues that the Board erred in concluding that her subjective intent in making the statements was irrelevant. Special counsel points out that Canons 1 and 2(A) do not explicitly include a scienter requirement, and argues that it would be inappropriate to interpret these mandatory standards of behavior in light of an individual judge's subjective intent. Both the Board in its decision and special counsel maintain that a judge may be disciplined for misconduct even where the judge acted in good faith without intent to violate the Code.

■ These arguments confuse two distinct issues. As a general matter, a judge may be sanctioned for conduct that the judge sincerely believed to be appropriate and correct. See, e.g., *In re Douglas*, 135 Vt. 585, 593, 382 A.2d 215, 219 (1977) (good faith not bar to finding of breach of judicial duty); *Patterson v. Council on Probate Judicial Conduct*, 577 A.2d 701, 708 (Conn. 1990) (scienter not essential to find ethical violation); *In re Neely*, 364 S.E.2d 250, 255 (W. Va. 1987) (court convinced that judge considered his actions legal, moral, and proper in every respect; nonetheless, judge's improper use of public employee violated Canon 2A and judge was subject to sanction). The Code imposes high standards of behavior on judges, standards that are necessary because of the "extraordinary responsibility of judicial office." *Douglas*, 135 Vt. at 592, 382 A.2d at 219. When a judge's behavior transgresses those standards, the judge may be subject to sanction despite the absence of bad faith or evil intent.

■ ■ At issue here, however, is whether respondent should be disciplined for making false, misleading and deceptive statements. Although the standard is admittedly high, judges do not violate the

Code when they unintentionally[2] make false or misleading statements — that is, when they make mistakes. See *In re Davey*, 645 So. 2d 398, 406-07 (Fla. 1994) (to constitute judicial misconduct, lack of candor must be knowing and willful; giving inaccurate or false statement under oath not misconduct unless when making statement judge did not believe it to be true); *In re Richter*, 409 N.Y.S.2d 1013, 1016-17 (Ct. Jud. 1977) (charge that judge gave false testimony to judicial conduct commission not proven where statements were not intentionally or willfully false; mistake in testimony does not constitute false swearing). The question before us, therefore, is whether respondent knowingly made false, deceptive and misleading statements under oath[3] at the VACJ hearings. Respondent does not dispute that such conduct, if proven, is an appropriate basis for discipline. See, e.g., *In re Fowler*, 602 So. 2d 510, 511 (Fla. 1992) (judge convicted of giving false statements to police violated code of judicial conduct; lying is serious offense that affects integrity of judicial system as well as public confidence in both judicial process and particular judge); *In re Perry*, 385 N.Y.S.2d 589, 590 (App. Div. 1976) (giving of false testimony by member of judiciary is inexcusable, as judicial officers have responsibility to seek out truth and evaluate credibility of others).

## III. Specific Allegations

Having established the legal standards that guide our decision, we now turn to our evaluation of the statements made by respondent at the VACJ hearings. We must determine whether some or all of the

---

[2] This does not mean that a judge may always escape discipline by claiming that he or she did not intend to deceive. Intent can, of course, be inferred from the evidence. For example, if the evidence shows that a judge had personal knowledge of facts contrary to the judge's statement, the judge's intent to deceive may be inferred. See, e.g., *In re Carver*, 531 N.W.2d 62, 68 (Wis. 1995) (judge disciplined for denying that defendant had contacted court or asked for special treatment, when in fact defendant had written to judge and asked for his assistance; judge's claim that he had forgotten was unreasonable given that he had received two letters from defendant one day earlier).

[3] Respondent maintains that the oath administered at the VACJ hearings had no legal significance, because it was not an oath given at a "proceeding in a court of justice" or an oath "required by law." 13 V.S.A. §§ 2901, 2904 (establishing criminal penalties for perjury and false swearing). She does not argue, however, that the absence of a legally valid oath immunizes her testimony from sanction under the Code of Judicial Conduct. In our view, what is relevant to this proceeding is that, in a hearing open to the public, respondent took an oath to tell the truth. Under those circumstances, regardless of the legal significance of the oath, knowingly making false or deceptive statements would not comport with the standards of judicial behavior imposed by Canons 1 and 2(A).

challenged statements were false or deceptive.[4] The statements can be divided into two groups: the first group consists of statements in which respondent denied that she had accused anyone of wrongdoing or mismanagement, and the second consists of statements in which she denied secretly taping meetings or conversations. We consider each group of statements in turn.

## A.

A hotly contested subject at the VACJ hearings was Judge Gretkowski's claim that respondent was "lying to the public in the media, particularly with respect to her allegations of county wrongdoing." In her testimony, respondent denied that she had made allegations of "wrongdoing" or "mismanagement," arguing that those words were used by the press and by Judge Gretkowski, but not by her. The Board found that several of the statements she made in this context were false or deceptive. Respondent argues that the Board took the statements out of context. She also claims that the challenged statements were expressions of her opinion and therefore should not be the basis for discipline.

As a general matter, we agree with respondent that the Board did not fully consider the context of the statements. For example, the Board found the following two similar statements to be misleading or deceptive:

> I have never alleged wrongdoing or mismanagement.
>
> . . . .
>
> I have never publicly charged or privately charged mismanagement at the court.

Respondent made both of these statements as she attempted to explain that she personally had never used the words "wrongdoing" or "mismanagement." The first statement, which comes early in respondent's testimony, appears in the following context:

---

[4] For purposes of this opinion, we make no distinction between "deceptive" statements and "misleading" statements. The Board did make a distinction, finding certain statements to be misleading but not deceptive, but did not explain the difference. Although their definitions are not identical, see, e.g., IV Oxford English Dictionary 328 (2d ed. 1989); IX *id.* 873, the words may be used as synonyms. See American Heritage Illustrated Encyclopedic Dictionary 443, 444 (1987) (listing "mislead" as synonym for "deceive"; giving "misleading" as one definition of "deceptive"). To the extent that "deceptive" may have a stronger connotation of intent, see *id.* at 444 ("deceptive" may mean "intended . . . to deceive"), that distinction is irrelevant here, for the reasons explained in the text.

I want you to know that nowhere in press coverage, nowhere . . . have I ever used the words wrongdoing or mismanagement. The words are there, but I am not the one saying them. I have never alleged wrongdoing or mismanagement.

We do not agree with the Board that this statement amounts to a "blanket denial that [respondent had] alleged conduct amounting to wrongdoing or mismanagement in her 'It's My Turn' article." The context of the testimony makes plain that respondent was merely denying that she had used those specific words in her article or other contacts with the press. Similarly, the second statement is part of respondent's lengthy discussion of various newspaper articles and editorials. She was again trying to explain that she had never used the word "mismanagement," a fact that the Board accepted as true. Given this context, and keeping in mind that misconduct must be proven by clear and convincing evidence, we cannot find that these statements were deceptive.

Next, the Board took issue with respondent's response to a question posed by her attorney during a discussion of certain county funds that respondent had wanted moved to an account bearing a higher rate of interest. After a review of the dispute over the funds, the following exchange took place:

[Attorney]: Were you charging anybody with corruption or doing something wrong?
[Respondent]: Of course not. I have never charged anybody with wrongdoing.

The question and answer can fairly be read as referring to the specific dispute over the interest rate for the county funds, and in that context, respondent's answer was true. Although respondent had argued that the funds should be placed in a different account as a policy matter, such a policy dispute cannot be equated with an allegation of wrongdoing or corruption. We do not accept the Board's finding that this statement was false, deceptive, and misleading.

At another point in the hearings, respondent discussed her problem with the use of capital construction or "fire fund" monies in the county budget. She did not approve of the transfer of these funds for other uses, but noted that "there is no evidence to indicate that this transfer of monies was secret or under the table." Shortly thereafter, she stated:

> At no time have I alleged that there is secrecy or lack of accountability. . . . In no way did the article meant [sic] to imply or accuse. I put down the facts that state law prohibits.

The Board found the reference to "lack of accountability" to be deceptive and misleading, apparently because of respondent's assertion in her "It's My Turn" article that assistant judges have "unchecked power to spend." As we consider this statement in the context of the fire fund discussion, we do not agree with the Board's finding. Respondent's concern in this matter was that use of the funds violated state law, not that the transaction was hidden or secret. Nor do we agree with the Board that respondent's denial that the article "meant to imply or accuse" was misleading. The Board supports its finding by stating that "[respondent] meant to imply [in the It's My Turn article] that a violation of the law had taken place." But respondent explains the statement as a continuation of her earlier point: that she had not suggested or implied that the use of the fire fund monies was secret or corrupt. As the statement is incomplete and grammatically unclear, it is open to multiple interpretations; we are unable to find by clear and convincing evidence that the Board's interpretation is the correct one.

Near the end of the hearings, in response to a question from a member of the "investigating committee," respondent returned again to discussing the newspaper article and the media's misuse of the words "wrongdoing" and "corruption." She concluded:

> [T]here is no question, those words permeate the press. But I never said them. There was no intention on my part in writing that article to imply any wrongdoing at all.

The Board found that this statement was false, deceptive, and misleading. The Board relied on respondent's use of the article to support a Judicial Conduct Board complaint against Judge Gretkowski as evidence that respondent intended to imply wrongdoing of some sort.

Finding that respondent's statement was knowingly false or deceptive is a difficult task. To do so, we would have to find that respondent intended her article to imply wrongdoing, despite her protests to the contrary. As we have elsewhere noted, imposing disciplinary sanctions on the basis of an implication "may raise intractable problems of perception and interpretation." *Bryan*, 164 Vt. at 595, 674 A.2d at 797.

The problem we identified in *Bryan* is far more pronounced in this context. Respondent is not charged with concealing or lying about specific facts, but with lying about what she meant to say when she expressed her opinion in a newspaper editorial. A half-dozen different readers of the article might have a half-dozen different interpretations of its meaning, but who among them could say conclusively that a particular interpretation is the one respondent intended? None of us is privy to respondent's inner thoughts as she drafted the article. Absent this psychic connection, we are hard-pressed to find that respondent lied when she explained what she meant to say in the article. Cf. *In re Kiley*, 546 N.E.2d 916, 918 (N.Y. 1989) (court unable to conclude that judge dissembled at disciplinary hearing when he gave his subjective intentions for engaging in particular conduct at issue).

We note, moreover, that respondent has given a plausible explanation for her statement. She maintains that she defines wrongdoing as synonymous with corruption, and uses it to refer to acts done for personal gain or with evil intent. Although, as she expressed in the article, she believed that certain county practices were unwise and possibly illegal, she did not believe that those practices were motivated by evil or corrupt intent. Respondent's personal definition of wrongdoing has support. The Oxford dictionary lists a number of definitions for wrongdoing: "[t]ransgression of or offense against the moral or established law; reprehensible action or behavior; evil-doing, misdoing; misconduct." XX Oxford English Dictionary 654 (2d ed. 1989). Thus, wrongdoing may refer to simple misconduct or a violation of law, but it may also carry the stronger negative connotation of immorality or evil upon which respondent relies. With respect to the Judicial Conduct Board complaint, she states that she felt obligated to report possible violations of the Code by Judge Gretkowski, but did not believe that Judge Gretkowski had acted corruptly or with evil intent. As we have previously discussed, judges may violate the Code despite their subjective good faith. In light of respondent's explanation, and the difficulty inherent in determining respondent's subjective intentions, we are unable to find by clear and convincing evidence that this statement was false or deceptive.

## B. Secret Taping

We now turn to respondent's statements denying that she secretly taped conversations. Fortunately, resolution of this matter is not

complicated by the same problems of interpretation and subjective intentions that we confronted earlier. One of the allegations considered at the VACJ hearings was Judge Gretkowski's claim that respondent secretly taped conversations and meetings. Although she admitted one instance in which she secretly taped a meeting, respondent otherwise flatly denied the allegation. During her statements and testimony at the VACJ hearings, respondent repeatedly defended herself against this charge:

> Except for one incident which you will hear about tomorrow I have never, ever taped an individual without letting them know first that I have taped.
>
> . . . .
>
> [Attorney]: Judge, at any other time since you have been an Assistant Judge have you secretly taped any meetings? [Respondent]: Never.
>
> . . . .
>
> And I want to tell you that in no way, shape or form did I ever, ever alter any tape; in the same way I am telling you I have never taped a conversation where I didn't think the person knew that I was taping.

Ironically, respondent herself produced the evidence that suggests that she did, in fact, secretly tape a conversation. At the VACJ hearing, respondent submitted a number of transcripts of meetings and conversations that she had taped, presumably because the discussions related to the various allegations covered at the hearings. One transcript recorded a conversation between respondent and Probate Judge Susan Fowler. Judge Fowler testified before the Board that she was not aware that this conversation had been taped. Based on this testimony and the content of the tape recording, the Board found the first of the above statements to be false, deceptive, and misleading. The Board did not make such a finding with respect to the other two statements.[5]

Obviously, respondent does not dispute that she taped the conversation, nor does she dispute that she never orally told Judge Fowler that their conversation was being recorded. She argues, however, that

---

[5] Respondent argues that the Board's finding that the first statement was false and deceptive should be disregarded because it is inconsistent with the Board's evaluation of the other two statements. It would have been helpful had the Board explained why it viewed the first statement differently from the others. In any event, we have reviewed the evidence independently and make our own findings in this matter.

her tape recorder was on her desk in plain view during the meeting, and that she reasonably assumed that Judge Fowler knew that the tape was running. She also emphasizes that she voluntarily produced the transcript of the meeting at the VACJ hearings, where she was defending herself against the charge that she taped people secretly — an action that makes little sense unless she thought that Judge Fowler was aware of the taping.

Overall, however, the evidence leads us to conclude that respondent secretly taped the meeting. The tape begins while respondent and Judge Fowler are walking upstairs together, although respondent's transcription does not reflect this part of the conversation. Respondent explains this by saying that she must have accidentally turned on the tape recorder, which was in her pocket, and that she did not realize what had happened until she later listened to the tape. This claim is not credible. If respondent did not know the recorder was already running, she would have had to turn the recorder on — or attempt to do so — when she and Judge Fowler reached the office. At that point she would have realized that it was already running.

Respondent's claim is also at odds with Judge Fowler's testimony that she did not see a tape recorder during the meeting. Because of the conflicting testimony, we must weigh the credibility of the witnesses — a task made more difficult by the fact that this Court did not hear the witnesses firsthand. The Board, which was in the best position to evaluate the witnesses, found Judge Fowler's testimony to be credible. We agree. Unlike respondent, Judge Fowler had no stake in these proceedings and thus no motive for dishonesty. Moreover, the tangible evidence — that is, the contents of the tape — supports Judge Fowler's account. First, neither respondent nor Judge Fowler mention the tape recorder during the conversation. We consider it highly unlikely that Judge Fowler would have noticed respondent remove the tape recorder from her pocket and set it on the desk, and make no comment. Second, Judge Fowler spoke rather freely during the conversation, discussing the sensitive topic of possible legal action against respondent. Again, we think it unlikely that Judge Fowler would have spoken in this way had she known the conversation was being recorded. For these reasons, we accept as true Judge Fowler's testimony that she did not see a tape recorder during the conversation.

According to Judge Fowler, upon entering the office she looked around the room and on respondent's desk for a tape recorder, because she "had been advised [that respondent] taped meetings."

She did not see one, although she did recall that the room was not unpacked and quite cluttered. It is nearly impossible to square this testimony with respondent's claim that she removed the tape recorder from her pocket and placed it on her desk. We would have to believe that, as the two women continued to converse with no noticeable break in the conversation, respondent removed the tape recorder from her pocket, fiddled with it, and set it on her desk — yet Judge Fowler observed nothing.

Judge Fowler also testified that the last part of the conversation took place in the hallway, not in the office. According to Judge Fowler, after respondent signed some vouchers for computers for the probate court, Fowler left the office and began walking down the hallway to the elevator. Respondent then came out of her office and down the hall, seeking to ask Judge Fowler a few more questions about possible legal action against respondent. Judge Fowler testified that at this point respondent stood very close to her, and appeared intense, anxious, and agitated. She also testified that no tape recorder was visible while they spoke in the hallway. According to respondent, this final exchange occurred in her office, not in the hallway. As evidence, she points to the brief pause in the conversation, arguing that Judge Fowler would not have had time to walk from the office to the elevator during those few seconds. Regardless of how far down the hallway Judge Fowler walked, however, the tape supports Fowler's testimony that she left the office and respondent followed and called after her.

Standing alone, each of respondent's explanations — that the early part of the conversation was taped by accident, that she had the tape recorder in plain view on her desk, and that Judge Fowler was mistaken about the conversation in front of the elevator — might be plausible. Strung together, however, the overall story is simply not credible. We are asked to believe that after respondent met Judge Fowler on the way upstairs, the tape recorder in her pocket accidentally turned on; that upon entering the office, respondent took out the tape recorder and attempted to turn it on, then set it on the desk without being observed by Judge Fowler, even though Judge Fowler was looking for a tape recorder; and that Judge Fowler's detailed and clear recollection of the conversation in the hallway was entirely mistaken. The inescapable conclusion is that respondent taped the conversation between Judge Fowler and herself without letting Judge Fowler know, either by telling her or by placing the tape recorder in plain view.

■ We therefore find that respondent knowingly made false statements at the VACJ hearings. All three statements quoted above are inconsistent with respondent's surreptitious taping of her meeting with Judge Fowler. Unlike the Board, we see no meaningful differences among the statements. Although phrased differently, each statement was essentially a denial of the allegation that respondent had taped other people without their knowledge. Based on the facts found above, respondent must have known that these denials were false. Cf. *In re Carver*, 531 N.W.2d 62, 68 (Wis. 1995) (judge disciplined for denying that defendant had contacted court or asked for special treatment, where evidence showed that defendant had written to judge and asked for his assistance). We agree with the Board that making these false statements violated Canons 1 and 2A of the Code of Judicial Conduct.

## IV. Sanction

Our final task is to determine the appropriate sanction for respondent's conduct. The political context and highly publicized nature of these charges cannot distract us from the seriousness of the underlying conduct: respondent participated as a witness in a public hearing, took an oath to tell the truth, and knowingly failed to do so. Regardless of the circumstances, such conduct by a member of the judiciary is inexcusable. When a judicial officer is dishonest, public confidence in the judiciary is threatened. See *Fowler*, 602 So. 2d at 511 (judge's dishonesty affects integrity of judicial system and public confidence in both judicial process and particular judge). Although this is a single instance of misconduct, it is nonetheless a serious matter affecting the integrity of the judiciary. See *In re Kilburn*, 157 Vt. 456, 458-59, 599 A.2d 1377, 1378 (1991) (where honesty or integrity are at issue, single action could result in finding of judicial misconduct); *Perry*, 385 N.Y.S.2d at 590 (ordinarily, isolated incidence of misconduct would be balanced against prior unblemished record, but giving of false testimony by member of judiciary is inexcusable).

We have looked to cases from this and other jurisdictions for guidance in disciplining respondent, but have found little aid. The sanctions imposed for this type of conduct range from reprimands, see *Fowler*, 602 So. 2d at 511 (judge pled guilty to offense of furnishing false information to police officer; public reprimand); *In re Brennan*, 447 N.W.2d 712, 713-14 (Mich. 1989) (law review article published by judge contained substantial plagiarized material; public censure), to suspensions of various length, see *Strickland v. Judicial*

*Inquiry Comm'n*, 388 So. 2d 1202, 1202-03 (Ala. 1980) (judge filed several false expense reports; six-month suspension); *Carver*, 531 N.W.2d at 70 (judge failed to disqualify himself from criminal case against defendant with whom he was personally acquainted and falsely stated from bench that defendant had not contacted him to ask for special treatment; fifteen-day suspension); *In re Dreyfus*, 513 N.W.2d 604, 605 (Wis. 1994) (judge filed false case status reports and misrepresented status of cases to deputy chief judge and to judicial investigator; fifteen-day suspension), to removal from the bench. See *In re Mazzei*, 618 N.E.2d 123, 126 (N.Y. 1993) (judge submitted two fraudulent credit card applications to bank; removed from bench); *Perry*, 385 N.Y.S.2d at 590 (judge gave false testimony under oath to judicial conduct commission; removed from bench); *In re Ritchie*, 870 P.2d 967, 968 (Wash. 1994) (judge repeatedly misrepresented purpose of travel as related to judicial activities and sought reimbursement for expenses; removed from bench). Although some cases discuss mitigating factors, see, e.g., *Fowler*, 602 So. 2d at 511; *Dreyfus*, 513 N.W.2d at 607, none fully explain the choice of one form of discipline over another.

█ In the absence of clear standards, we rely primarily on our experience and judgment to evaluate the misconduct and reach a decision as to sanction. Because of the seriousness of the offense, we do not believe that reprimanding respondent for her conduct would be sufficient to repair the damage to the reputation of the judiciary. See *In re O'Dea*, 159 Vt. 590, 606, 622 A.2d 507, 517 (1993) (purpose of judicial discipline is to enhance public confidence in the integrity and fairness of the justice system). Nor do we believe that respondent's behavior warrants the ultimate sanction of removal. We conclude that respondent should be reprimanded for this conduct and suspended from serving in a judicial capacity for a period of one year.

*Assistant Judge Althea Kroger is hereby publicly reprimanded for the violations of the Code of Judicial Conduct found herein. She is further suspended from serving in a judicial capacity for a period of one year from the date of this order.*