2009 VT 42

## In re Assistant Judge William Boardman

[979 A.2d 1010]

No. 08-212

Present: **Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Grearson, D.J., Specially Assigned**

Opinion Filed May 1, 2009

Motion for Reargument Denied June 2, 2009

Motion for Reconsideration Denied June 22, 2009

*William A. Nelson*, Middlebury, for Petitioner-Appellee.

*Eric R. Benson*, Westford, for Respondent-Appellant.

*Paul S. Gillies*, Montpelier, for Amicus Curiae The Vermont Association of County Judges.

¶ 1. **Per Curiam.** A formal complaint to the Judicial Conduct Board charged respondent, an assistant judge for Windsor County, with two counts of misconduct; the first concerned an alleged conflict of interest resulting from respondent's relationship with Emerge, a nonprofit corporation providing services to the Windsor Family Court; the second alleged a failure to maintain the dignity

and integrity of his office during a reelection campaign. Following a hearing, the Board issued an order sustaining both charges, finding that respondent had violated several canons of the Code of Judicial Conduct, and recommended the following sanctions: (1) suspension from the performance of all assistant judge duties, including adjudicative and administrative functions, for a period of six months and until respondent resigns from the board of Emerge and any other organization doing business with the county; (2) completion of a judicial ethics course; and (3) recusal from all county funding decisions involving any organization in which respondent has served on the board or governing body within the last five years.

¶ 2. Although respondent raises a number of claims, he principally denies any conflict of interest in his relationship with Emerge or impropriety in connection with his reelection campaign. The Vermont Association of County Judges (VACJ) has filed an amicus curiae brief, urging the Court to refrain from suspending respondent, or any assistant judge, from the performance of administrative duties, and asserting that the recommended sanction is disproportionate to the offenses. As explained below, we affirm the Board's findings and conclusions on the conflict-of-interest charge, generally adopt its proposed sanctions, and impose an additional sanction barring respondent from participating in any case that involved Emerge in the past, or that involves Emerge for one year in the future following the completion of his suspension.

I.

¶ 3. The material facts as found by the Board may be summarized as follows. Respondent is one of two elected assistant judges for Windsor County. He was first elected in 1991 and has since served continuously in that office, his most recent reelection having occurred in November 2006. Respondent is also one of the founders, and a current board member, of a nonprofit corporation called Emerge, which provides supervised parent-child contact and visitation services to the family court in high-conflict cases. Emerge is currently the only nongovernmental entity to receive money from Windsor County. The Emerge bylaws set aside a seat on its board for the Windsor County assistant judges so long as it receives funding from the county. Respondent is the only assistant judge, however, to have served on the board, the others having declined membership.

¶ 4. As the Board here found, Emerge has "struggled financially" since its inception. It has received annual grants from Windsor County, including $12,000 in county funds during each of the two most recent fiscal years, and favorable treatment in its use and ultimate purchase of a county building, the former sheriff's office located on seven acres in the Town of Hartford. This transaction forms the basis of the conflict-of-interest charge and requires some additional explanation. Before the office building in question was vacated, the county listed the property for sale with an experienced local broker, setting the price — in consultation with the broker — at $159,000. The asking price was later raised to $189,000. In April 2002, the county accepted an offer from Emerge and signed a purchase and sale agreement for $160,000. Respondent testified that he had excused himself from Emerge board meetings when the transaction with the county was discussed, but there is no dispute that respondent accepted the Emerge offer on behalf of the county and signed the purchase and sale agreement.

¶ 5. Emerge had until June 15, 2002, to secure financing but failed to do so and the transaction was not completed. The county did not, however, treat the failure as a default and relist the property for sale. Instead, Emerge moved into the building and commenced operations in the Fall of 2002, operating under an unsigned month-to-month lease/purchase agreement for the next five years until it executed another purchase and sale agreement with the county in July 2007. During this period, Emerge was chronically late with its monthly rental payments, as well as its share of the electric bills, so that by the time of the closing on the second deal it owed the county some $12,750 in back rent and $10,703 in unpaid electrical charges.

¶ 6. The Board found, and the evidence shows, that respondent was the "go to" person in the county responsible for the ongoing landlord-tenant relationship with Emerge, and was further involved in helping Emerge to obtain financing for its ultimate purchase of the property in 2007. Prior to the sale, however, a second potential purchaser appeared in the form of the Town of Hartford. In August 2006, the Hartford town manager had written to respondent and the other assistant judge expressing a strong interest in purchasing the property, with the understanding that the purchase price remained at $160,000. The town sent a follow-up letter to respondent in March 2007, and a series of

e-mails in March and April reiterating its keen interest in purchasing the property for cash. Although the county had no binding purchase and sales agreement or purchase option with Emerge at the time, it did not respond favorably to the town's inquiries, but instead sold the property to Emerge a few months later, in July 2007. Credits granted by the county reduced the amount paid by Emerge to $93,000, and additional credits reduced the amount actually received by the county to about $72,000. The Board found, and the evidence showed, that respondent wanted to sell the property to Emerge to the exclusion of any other parties.

¶ 7. Based on the forgoing, the Board found that respondent had participated in "both sides of the [Emerge] transaction" and had "violated his fiduciary duty to the County by selling County property to the very organization on whose Board he sat, at a favorable price, eschewing at least one other cash offer which would have brought a higher return to the County for the sale and ignoring much of the accrued debt of the tenant (Emerge)." As a result of this conflict of interest and patent appearance of impropriety, the Board concluded that respondent failed to maintain the "high standards of conduct" and integrity required of judicial officers, in violation of Canon 1 of the Code of Judicial Conduct; failed to act "in a manner that promotes public confidence in the integrity" of the judiciary, in violation of Canon 2(A); failed to "discharge [his] administrative responsibilities without bias or prejudice," in violation of Canon 3(C)(1); and failed to properly disqualify himself from participating in a "proceeding in which [his] impartiality might reasonably be questioned," in violation of Canon 3(E). In addition, the Board concluded that respondent's extra-judicial service as a member of Emerge's board of directors had "cast reasonable doubt on [his] capacity to act impartially as a judge" and "interfere[d] with the proper performance of [his] judicial duties," in violation of Canon 4(A)(1) and (3).

¶ 8. The events which formed the basis of the second misconduct charge against respondent arose from his participation in a three-way primary race for reelection in the fall of 2006. On or about October 18, 2006, respondent placed a campaign sign on the front lawn of a business in Quechee, but the sign was apparently removed the following day. Respondent assumed that it had been stolen. Accordingly, on October 21, 2006, respondent sent a note (which respondent has characterized as a "media advisory" or

press release) to a local newspaper, the Vermont Standard, characterizing the "theft" as a "political dirty trick" which "appeared to be a continuation of the internecine nastiness directed at me personally during the Democratic primary last summer."[1] Several days later, respondent had what the Board found to be a "tense confrontation" with the Quechee business owner about the sign's removal, and on October 26, 2006, an article appeared in another newspaper, the Valley News, reporting that, contrary to the "press release" circulated by respondent, the sign had not in fact been stolen but rather had been removed by the business owner herself.

¶ 9. Although respondent was thus aware of the true state of affairs concerning the sign by October 26, 2006, he did not withdraw the note that he had previously sent to the Vermont Standard, which published it as a letter to the editor on November 2, 2006, within days of the election. The article appeared in conjunction with another letter to the editor from respondent touting his "judicial experience." The editor of the Vermont Standard testified that respondent had contacted him several days earlier asking why he had not yet published his letter, although respondent claims that the inquiry was in reference to a different letter that he had submitted, which was subsequently published on November 9, 2006. There is no dispute, however, that respondent did not thereafter submit a letter of correction or retraction to the paper to correct the misstatement concerning the alleged theft.

¶ 10. Based on these facts, the Board found that respondent knew or should have known that his submission containing the false allegation of theft would be published, and failed to retract or correct it, "leaving the body politic with the [false] impression that his missing campaign sign was stolen by one of his political opponents." As such, the Board concluded that respondent had failed to act in a manner consistent with the dignity and integrity of the judiciary, in violation of Canons 5(B)(2) and 5(C).

¶ 11. On the question of sanctions, the Board determined that a public reprimand was inadequate in light of the seriousness of the offenses and respondent's prior reprimand for a violation involving the misuse of official stationery, signifying respondent's overall

---

[1] Respondent's original submission to the newspaper is not in the record, and it is unclear whether it was sent by regular mail or e-mail.

lack of appreciation that judicial office is a public trust with concomitant responsibilities. Accordingly, as earlier noted, the Board recommended the following sanctions: (1) that respondent be suspended from all assistant-judge duties — whether adjudicative, administrative, or otherwise — for a period of six months and until he has resigned from the board of Emerge and from any other organization doing business with, or receiving funds from, Windsor County; (2) that respondent complete a judicial ethics course; and (3) that respondent immediately recuse himself from any and all county funding decisions for any organization on whose board or governing body he has served during the preceding five years. This appeal followed.

## II.

¶ 12. We observe at the outset that while the findings and conclusions of the Board "carry great weight," they are solely advisory in nature; the final and ultimate decision in judicial disciplinary matters rests with this Court. *In re Bryan*, 164 Vt. 589, 593, 674 A.2d 793, 796 (1996). Hence, "[w]e are obliged to review and evaluate the evidence independently to determine if the charges against respondent are supported by clear and convincing evidence." *In re Kroger*, 167 Vt. 1, 5, 702 A.2d 64, 66 (1997).

¶ 13. Although numerous and somewhat disorganized, respondent's contentions on appeal resolve to one overriding theme, expressed in his assertion that the evidence fails to support the Board's finding of a conflict of interest in the Emerge transaction. Respondent maintains, rather, that the county and Emerge shared a "confluence" of interest and that "supporting Emerge [was] in the public interest of the county." The claim is both mistaken and misplaced. It is mistaken because a public official's overriding and undivided duty of loyalty is to the public he or she serves. See, e.g., *Anderson v. Zoning Comm'n of Norwalk*, 253 A.2d 16, 19 (Conn. 1968) ("[A] man cannot serve two masters at the same time and the public interest should not be entrusted to an official who has a pecuniary, personal or private interest which is or may be in conflict with the public interest."); *People ex rel. Smith v. Brown*, 828 N.E.2d 306, 309 (Ill. App. Ct. 2005) ("[P]ublic policy demands that an office holder discharge his duties with undivided loyalty.") (quotation omitted). The evidence

here reveals not only an appearance of divided loyalties inherent in respondent's competing fiduciary duties to the county and Emerge, but a genuine conflict between respondent's public duty as an assistant judge to sell the county property occupied by Emerge at the highest possible price consistent with the public interest and his corporate duty, as a director of Emerge, to purchase the property for the lowest possible amount. See, e.g., *Ross v. Wilson*, 127 N.E.2d 697, 701 (N.Y. 1955) (observing that public officials are "temporary trustees" of public property and as such have a duty "to obtain the best price obtainable in their judgment for any lawful use of the premises"); *Greater Fourth St. Assocs. v. Smithfield Twp.*, 816 A.2d 388, 392 (Pa. Commw. Ct. 2003) ("public officers . . . are fiduciaries and, when dealing with public property, must act with the utmost good faith, fidelity and integrity") (quotation omitted); *Price Dev. Co. v. Orem City*, 2000 UT 26, ¶ 26, 995 P.2d 1237 ("public property is held in trust for the public and may not be disposed of other than in good faith and for adequate consideration") (quotation omitted). As the Board correctly found, respondent used his office as assistant judge to spurn an inquiry from another buyer for a full cash purchase and ensure that Emerge obtained the property at a much reduced price, in direct contravention of his fiduciary duty to the county.

¶ 14. The conflict of interest thus could not have been clearer, and respondent's continued assertions to the contrary are unpersuasive. Indeed, as the Board here noted, the potential conflict was of sufficient concern to persuade respondent's colleague, Assistant Judge Singer, to decline membership on Emerge's board of directors precisely because of the county's ongoing relationship with Emerge and his perception that, as he testified, it would place him "on both sides of [the Emerge] transaction." The issue even became a matter of public concern during the run-up to the 2006 election, when local newspapers reported criticisms of respondent by his primary opponents and others in the legal community on the ground that he was using his dual positions to engineer a "sweetheart deal" for Emerge.

¶ 15. Respondent's argument that he acted on behalf of the county's interests is also misplaced. The overriding goal of judicial discipline is to preserve public confidence in the integrity and impartiality of the judiciary. *In re O'Dea*, 159 Vt. 590, 604, 622 A.2d 507, 515-16 (1993). That confidence was plainly tested, if not indeed significantly degraded, by respondent's actions in this

case. Respondent's claim to have acted in good faith on the county's behalf is immaterial. As we explained in *Kroger*, the Code of Judicial Conduct imposes stringent standards of behavior on judges precisely because the office carries "extraordinary responsibilit[ies]," and when a judge transgresses those standards he or she "may be subject to sanction despite the absence of bad faith or evil intent." 167 Vt. at 6, 702 A.2d at 67 (quotation omitted); see also *In re Barnes*, 2 So. 3d 166, 171 (Fla. 2009) ("nor [do] the good motives of a judge excuse departure from the guidelines established in the Code of Judicial Conduct"). Nor is it relevant whether respondent realized any tangible personal benefit or pecuniary gain from the transaction. Public confidence in the integrity of the judiciary requires that decisions of public importance not be influenced by private loyalties, regardless of motive. See, e.g., *Bankston v. Bd. of Ethics for Elected Officials*, 715 So. 2d 1181, 1187 (La. 1998) (finding a conflict of interest where parish councilman worked for private nonprofit community agency that received parish funds, and the fact that the official did not "in fact receive[] a personal benefit does not cure the appearance of impropriety"); *Zell v. Borough of Roseland*, 125 A.2d 890, 893 (N.J. Super. Ct. App. Div. 1956) (finding a conflict of interest where board member who voted on zoning decision affecting church was a member of the church, since it created a "potential for influence of his action" regardless of whether he was "in fact completely free of any improper or pecuniary motivation"). There is no question that respondent's duties of undivided loyalty, impartiality, and independence were compromised in this matter, to the detriment of his office and the public interest.

¶ 16. We hold, therefore, that the record contains clear and convincing evidence that respondent, by his actions, created an appearance of impropriety and undermined confidence in the integrity and impartiality of the judiciary, in violation of Canons 1 and 2(A); failed to discharge his administrative responsibilities "without bias or prejudice," in violation of Canon 3(C)(1); and engaged in extrajudicial activities which both interfered with the proper performance of his duties and "cast reasonable doubt on [his] capacity to act impartially," in violation of Canon 4(A)(1) and (3).[2]

---

[2] Our holding that respondent violated Canons 1, 2(A), 3(C)(1) and 4(A)(1) renders it unnecessary to address respondent's claim that the Board misinterpreted the

■ ¶ 17. Respondent's remaining claims in this regard require no extensive discussion. He asserts that the evidence before the Board was insufficient to support its finding of probable cause for the filing of formal charges, as required by Rule 7(5) of the Rules Governing Disciplinary Control of Judges. Contrary to respondent's claim, nothing in the rules requires that special counsel's preliminary investigation report must be based on personal knowledge of the facts alleged, or that the initial complaint must be verified. See *In re Hill*, 152 Vt. 548, 560, 568 A.2d 361, 368 (1989) (rejecting similar claim that complaint was deficient because it was not verified). He also asserts that the Board erred in denying his motion to dismiss, and in allegedly failing to rule on his motion for a directed verdict, but our finding of misconduct based on clear and convincing evidence renders both claims moot.

■ ■ ¶ 18. Respondent further maintains that the Board chair lacked the authority, without Board approval, to rule on his motions for extension of time, to compel discovery, and to modify the discovery schedule, and erroneously denied the motions. Respondent also claims that the Board chair lacked the authority to serve as presiding officer at the hearing. As we have explained, alleged procedural errors of this kind "will not affect our consideration of a judicial misconduct case unless . . . the errors actually prejudiced respondent," and such prejudice must "rise to the level of a due process violation" to warrant reversal of the decision. *In re O'Dea*, 159 Vt. at 595, 622 A.2d at 511. Respondent has not shown that any of the alleged procedural errors rise to this level. Similarly, respondent's claim that the Board erred in failing to rule within thirty days of the hearing, as required by Rule 9 of the Rules Governing Disciplinary Control of Judges, does not identify a jurisdictional or prejudicial defect requiring reversal. See *id.* at 596-98, 622 A.2d at 511-12 (Board's failure to issue

term "proceeding" to include nonadjudicative matters when it concluded that he improperly failed to disqualify himself from "a *proceeding* in which the judge's impartiality might reasonably be questioned," in violation of Canon 3(E)(1), and improperly accepted a position on the board of an organization that was likely to "engage[] in *proceedings* that would ordinarily come before the judge," in violation of Canon 4(C)(3)(a)(i) (emphasis added). However potentially significant standing alone, these additional alleged violations are essentially superfluous in view of the clear and convincing evidence that respondent's actions violated the other canons identified by the Board.

order within thirty days did not deprive it of jurisdiction or prejudicially deny respondent due process).[3]

■ ¶ 19. Respondent next asserts that the Board erred in allowing lay opinion testimony on the question of the alleged conflict of interest and appearance of impropriety. Although respondent moved before trial to exclude lay opinion evidence, the Board ruled that it would reserve ruling on the issue until such testimony was offered at the hearing. Disciplinary counsel called Robert Sand, Windsor County State's Attorney, who testified without objection as to his recollection of a candidate's forum in which respondent was asked about the potential conflict of interest involving Emerge. On cross-examination, respondent's attorney specifically asked attorney Sand "what you see as the impropriety in [respondent's] having a hat on Emerge and a hat in the county?" Later, on redirect, special counsel asked a similar question, which the witness also answered without objection. Accordingly, any claim of error in this regard was plainly waived. *State v. Decoteau*, 2007 VT 94, ¶ 10, 182 Vt. 433, 940 A.2d 661 (failure to make timely objection at time of admission of testimony waives any claim of error on appeal).

■ ■ ¶ 20. Finally, respondent contends that the Board erred in rejecting his claim that expert evidence was required to establish a violation of the Code. Although it cites to a somewhat lengthier pretrial motion, respondent's appellate argument consists of the conclusory assertion that assistant judges are unique and that the Board's findings cannot therefore be established without expert evidence. The claim is inadequately briefed and argued, and therefore need not be addressed on appeal. *Wilkins v. Lamoille County Mental Health Servs., Inc.*, 2005 VT 121 ¶ 15, 179 Vt. 107, 889 A.2d 245. We would observe, however, that as an agency comprised of judges, lawyers, and lay persons experienced in the area of judicial ethics, the Board ordinarily does not require expert evidence to support its findings and conclusions. See *Braun v. Bd. of Dental Exam'rs*, 167 Vt. 110, 115, 702 A.2d 124, 127 (1997) (reasoning that, as a body composed of professionals, the Medical Board has the power to apply its own expertise in evaluating the evidence).

---

[3] Our holding renders moot the Board's motion to supplement the record with an affidavit from the Board chair explaining his rulings.

## III.

¶ 21. Before turning to the question of sanctions, it remains to be determined whether the evidence also supports the Board's finding of misconduct arising out of the facts, previously discussed, surrounding the publication of respondent's letter to the editor. As noted, the Board found that respondent knew or should have known that his submission to the Vermont Standard would be published as a letter to the editor, knew that it contained a false allegation that his sign had been stolen, and failed to take action to withdraw the letter or send a correction, leaving the false impression that the sign had been stolen by one of his primary opponents. These actions, the Board concluded, were a "downward departure from the dignity" expected of an assistant judge in conducting a campaign for reelection, and inconsistent with the integrity expected of judicial officers.

¶ 22. As we cautioned in *In re Kroger*, judges do not violate the Code when they unintentionally make false or misleading statements, and we must therefore take care when "imposing disciplinary sanctions on the basis of an implication" of such misconduct. 167 Vt. at 10, 702 A.2d at 70. Respondent here has steadfastly maintained that his note to the Valley Standard was not intended for publication as a letter to the editor, but was simply a media advisory or press release, and he therefore could not have anticipated that it would be published. Respondent's original submission to the newspaper is not in the record. Accordingly, it is uncertain whether it was sent to the newspaper by regular mail or e-mail, whether it was captioned as a letter or press release or otherwise, and whether it was addressed "to the editor" or contained other language suggesting that it was intended for publication as a letter to the editor.

¶ 23. The Board nevertheless rejected respondent's assertion on several grounds. First, it noted that there was no evidence that the submission was titled a "media advisory," but by the same token we note that there was no evidence it was in the form of a letter to the editor. Moreover, consistent with respondent's claim, the Valley News article which revealed the truth about the sign's disappearance characterized respondent's article as a "press release," and there is no indication that the Valley News — which had also apparently received the submission — considered it to be a letter or published it as such. The editor of the Vermont

Standard also testified that it was possible he had added the words "to the editor" to the beginning of the article.

¶ 24. The same editor also testified, and the Board found, that the Vermont Standard always published all of respondent's letters to the editor, suggesting that respondent should have been aware of the likelihood of publication. Yet the editor also acknowledged that respondent had sent out media advisories or press releases in the past, which he had not published. The Board also noted that respondent had sent an e-mail to the editor to inquire why his letter had not been published, but respondent later claimed that he was referring to a different letter, and the editor acknowledged that he had merely assumed respondent was referring to the letter involving the campaign sign, and that it was possible the reference was to a different letter, published on November 9, 2006, after the election.

¶ 25. Together, these facts lend reasonable support, in our view, to respondent's claim that he did not submit the article in question for publication, was unaware that it would be published, and therefore was also unaware of the need to contact the newspaper to withdraw it. Contrary to the Board, therefore, we are not persuaded that clear and convincing evidence demonstrates that respondent knew or should have known that his submission would be published, and should have taken steps to withdraw it before that occurred.

¶ 26. Apart from his failure to prevent publication, the Board also faulted respondent for failing to submit a note of retraction or correction after the letter's publication. We agree that a letter along these lines would have been the more dignified and appropriate response to the misleading letter. Respondent is also correct, however, that such a retraction would probably not have appeared until after the election, and therefore could not have had any practical impact on the outcome of the election. On the whole, therefore, we are unable to find by clear and convincing evidence that respondent's conduct in this matter was inconsistent with the integrity and independence of the judiciary.[4]

---

[4] Our conclusion renders it unnecessary to address respondent's claim that the finding of misconduct on this charge violates his constitutional right to freedom of speech.

## IV.

¶ 27. We turn finally to the question of sanctions. Both respondent and amicus VACJ focus principally on the Board's recommendation to suspend respondent from all responsibilities, including *administrative* duties, for six months. Respondent asserts that while this Court (and, by extension, the Board) may exercise disciplinary jurisdiction over an assistant judge's administrative functions, it may not impose sanctions affecting those functions, a prerogative which he maintains lies exclusively with the Legislature. Although the VACJ acknowledges the Court's authority to suspend an assistant judge from administrative duties, it urges the Court to refrain from doing so for "prudential reasons."[5] We are not persuaded by either position.

¶ 28. As we recently observed in *Velardo v. Ovitt*, 2007 VT 69, ¶ 8, 182 Vt. 180, 933 A.2d 227, the assistant judge "is a unique Vermont judicial officer" who is elected at the county level and serves certain limited adjudicative and executive functions. Although the composition of the superior and family courts include, by definition, two assistant judges if "available," 4 V.S.A. §§ 112(a), 452(a), their participation in all such proceedings is limited to the resolution of questions of fact in cases decided by the court. *Id.* §§ 112(b), 457(b). In addition, in certain limited circumstances assistant judges may hear and decide small claims actions, 12 V.S.A. § 5540a, judicial bureau matters, 4 V.S.A. § 1108, parentage and child support actions in family court, *id.* §§ 461a, 461b, and probate matters, *id.* § 355.

¶ 29. Assistant judges also exercise certain county executive functions, including — as this case illustrates — the "care and superintendence of county property," 24 V.S.A. § 131, as well as preparation of the county budget, *id.* § 133(a), appointment of the county clerk (with the concurrence of the presiding judge), *id.* § 171, and appointment of the county treasurer. *Id.* § 211.

¶ 30. There is little question, in our view, that the Vermont Constitution, statutes, and Code of Judicial Conduct vest plenary authority in this Court to exercise disciplinary control over *all* functions of assistant judges, administrative, adjudicative and

---

[5] Although VACJ's brief argues that suspension of an assistant judge from administrative duties is beyond the jurisdiction of this Court, at oral argument counsel for the VACJ conceded the Court's power to suspend, but urged that it refrain from doing so for prudential reasons.

otherwise. The Constitution broadly provides that the Court shall have "disciplinary authority concerning all judicial officers," Vt. Const. ch. II, § 30, and "may suspend . . . judges of all subordinate courts from the judicial function for such cause and in such manner as may be provided by law." *Id.* ch. II, § 36. Consistent with this broad mandate, the Legislature has provided that the Court shall have "disciplinary control of all judicial officers of the state, in addition to and not inconsistent with the constitutional powers of the general assembly in those matters," 4 V.S.A. § 3; shall adopt and promulgate a code of judicial ethics binding on all judicial officers, *id.*; and may impose disciplinary sanctions, "including when appropriate suspension from judicial duties for the balance of the term of the judicial officer charged." *Id.*

¶ 31. Nothing in the constitution or its implementing legislation suggests that the scope of "judicial functions" or "judicial duties" subject to discipline is narrowly limited to adjudicative matters. On the contrary, we have consistently maintained — without dispute from the legislative branch — that the scope of this Court's disciplinary authority is comprehensive; it includes conduct unrelated to adjudicative proceedings, see, e.g., *In re Steady*, 161 Vt. 636, 637, 641 A.2d 117, 119 (1994) (mem.) (imposing sanction for purchasing paid political advertisement for various candidates for political office in violation of Code); *In re Kroger*, 167 Vt. at 16, 702 A.2d at 73 (imposing suspension for knowingly making false statements under oath during investigation into misconduct), and even "goes beyond the professional affairs of judges and into their nonjudicial lives." *In re Hill*, 152 Vt. at 571, 568 A.2d at 373. The Code of Judicial Conduct is similarly comprehensive in its scope, defining "judicial duties" to "include all the duties of the judge's office prescribed by law," Canon 3(A), and prescribing ethical rules specifically applicable to a judge's exercise of "administrative responsibilities." Canon 3(C).

¶ 32. Although respondent appears to acknowledge this Court's authority to review administrative misconduct, he argues that it is nevertheless powerless to suspend administrative functions as a constitutional matter. As noted, the VACJ argues that, for similar reasons, the Court should refrain as a prudential matter from imposing such sanctions. Both arguments are based on the fact that assistant judges are *elected* officials and that, as

such, the sanction for maladministration should arguably be reserved to the people's elected representatives through the power of impeachment. See Vt. Const. ch. II, § 58 ("Every officer of State, whether judicial or executive, shall be liable to be impeached by the House of Representatives, either when in office or after resignation or removal for maladministration."). As noted earlier, however, the Legislature has made it clear that this Court's disciplinary authority, including the power to suspend, is "in addition to" the constitutional authority of the general assembly, 4 V.S.A. § 3, and we have held that this provision was specifically intended to "supplement" the Legislature's impeachment power, "negating any contention that those disciplinary powers conflicted with the Legislature's own power of impeachment." *In re Hill*, 152 Vt. 576, 577, 569 A.2d 446, 446-47 (1989).

¶ 33. We thus discern no legislative or constitutional intent to supersede this Court's disciplinary power in favor of legislative impeachment for any judicial officer, elected or otherwise. Indeed, if *election* were the critical criterion, assistant judges — not to mention elected judges of probate — would be effectively immune from disciplinary sanctions even for misconduct in their purely adjudicative capacities. The argument thus proves too much.

¶ 34. Respondent and the VACJ also claim that suspension of respondent's administrative functions poses certain "practical" difficulties warranting judicial restraint, but the reality is quite the reverse. As we recognized in *Hill*, impeachment is a limited and cumbersome remedy; it is unavailable where the judge has already retired, thus leaving the public with no "power to impose an effective sanction" absent disciplinary action by this Court, *id.* at 578, 569 A.2d at 447, and since removal from office is the *only* consequence of impeachment it also lacks the flexibility to tailor a disciplinary remedy to the particular facts and circumstances of each case.

¶ 35. The VACJ and respondent further claim that suspending respondent from administrative duties would effectively compromise county functions because a single assistant judge allegedly cannot act alone to perform such duties. The argument is premised on the fact that the statutes setting forth those duties generally refer to assistant judges in the plural. See, e.g., 24 V.S.A. § 133(a) ("the assistant judges shall prepare a proposed budget"); *id.* § 171 ("the assistant judges . . . shall

appoint a county clerk"). As we have explained, however, "[i]t is an accepted rule of statutory construction that words used in the singular may be read as to include the plural, and the plural the singular, except where a contrary intention plainly appears." *In re N.H.*, 135 Vt. 230, 235, 373 A.2d 851, 855-56 (1977); see also 1 V.S.A. § 175 (providing the same). We discern no specific legislative intent to disable one assistant judge from performing the administrative duties of office where the other is unavailable, whether as a result of disciplinary suspension, illness, vacation, or for other reasons. On the contrary, the Legislature has adopted a flexible approach to the nonavailability of assistant judges in the adjudicative context, see 4 V.S.A. § 112(c) ("If two assistant judges are not available, the [superior] court shall consist of one presiding judge and one assistant judge."); *id.* § 457(c) ("If two assistant judges are not available, the [family] court shall consist of one presiding judge and one assistant judge."), and we see no reason why it would not apply a similar approach to administrative matters. We therefore find no statutory, constitutional, or practical impediment to sustaining the recommended suspension of respondent from all duties — administrative, adjudicative, or otherwise — for a period of six months.

¶ 36. Nor are we persuaded that the recommended sanction is excessive. As previously discussed, the conflict of interest inherent in the Emerge transaction was patent; it was recognized by respondent's fellow assistant judges, raised public concerns, and should have resulted in respondent's immediate resignation from the board of Emerge and recusal from all proceedings on behalf of the county in the sale of the property in question. In our view, nothing *less* than the recommended sanction of a six month suspension from all assistant-judge duties would be adequate to restore public confidence in the integrity, impartiality, and independence of the judiciary. We also concur in and adopt the Board's recommendation that respondent recuse himself from all county funding decisions from any organization on whose board he has served within the last five years, and complete a judicial ethics course at his own expense with prior approval of the Board.

¶ 37. We also conclude that an additional sanction is necessary to restore and enhance public confidence in an impartial judiciary. The VACJ rightly notes that there is at times a "tenuous boundary" between an assistant judge's executive and adjudicative

duties. Rather than lenience in enforcing such boundaries, however, we believe that this requires heightened vigilance to ensure against even the appearance of conflict or impropriety. In concrete terms, we are concerned about the appearance of impropriety resulting from respondent's participation in any family court case in which Emerge was, is, or might be engaged to provide parent-contact, supervised visitation, or other services to the court or parties. Accordingly, we hold that respondent must be disqualified from any case in which Emerge has provided services in the past, or is engaged to provide services within one year from the completion of respondent's suspension.

*Respondent is hereby suspended from the performance of all official duties for six months, commencing from the date this decision becomes final under V.R.A.P. 41(b). In addition to Emerge, respondent shall resign from the board of directors or the governing body of all organizations doing business with or seeking funding from Windsor County. Respondent is further ordered to complete a judicial ethics course, at his own expense, which has been approved by the Judicial Conduct Board. Upon the completion of these requirements, respondent shall thereafter recuse himself from all county funding decisions for any organization on whose board or governing body he served during the preceding five years. Respondent is further prohibited from participating in any case in which Emerge was previously involved, or any case in which Emerge is involved for one year from the date of his return to official duties.*