# ENTRY ORDER

2017 VT 48

SUPREME COURT DOCKET NO. 2017-136

MAY TERM, 2017

| | | |
|---|---|---|
| In re Assistant Judge Paul Kane | } | ORIGINAL JURISDICTION |
| | } | |
| | } | from: |
| | } | Judicial Conduct Board |
| | } | |
| | } | DOCKET NO. 16.004 |

In the above-entitled cause, the Clerk will enter:

¶ 1.     Pursuant to Rule 10(3) of the Rules of Supreme Court for Disciplinary Control of Judges, we hereby order that respondent be immediately and permanently suspended from judicial office and prohibited from holding judicial office in Vermont in the future.  Upon review of the Judicial Conduct Board's decision, the Court orders review on its own motion, adopts the Judicial Conduct Board's decision in its entirety as a final order of this Court, waives briefing and oral argument, and orders that the decision be published in the Vermont Reports.

## STATE OF VERMONT

| | |
|---|---|
| JUDICIAL CONDUCT BOARD | Docket No. 16.004 |

In re:
Assistant Judge Paul Kane

## DISPOSITION REPORT

Pursuant to Rule 10 of the Rules of Supreme Court for Disciplinary Control of Judges, the Judicial Conduct Board (the Board or JCB) issues the following disposition report.

### Introduction

"The primary purpose of judicial discipline is to 'protect the public, ensure the evenhanded administration of justice, and preserve and enhance public confidence in the integrity and fairness of the justice system.'" *In re Balivet*, 2014 VT 41, ¶ 39, 196 Vt. 425 (quoting *In re O'Dea*, 159 Vt. 590 (1993)).  Pursuant to that purpose, the Board must remove from the Bench those individuals found to be unfit for judicial service.  Fitness for service requires not only a knowledge of the law, but also the utmost in integrity.  To maintain public confidence in the Judiciary, a judge

must demonstrate honesty, candor, and the commitment to ethical principles both on and off the bench.

This matter was initiated based on media reports of allegations that former assistant judge Paul Kane[1] may have engaged in improper conduct regarding the assets of his uncle's wife, Katherine "Kay" Tolaro. On February 22, 2016, the Board initiated an investigation into these allegations. On February 25, 2016, Mr. Kane agreed to step down from his position during the pendency of the investigation. After the Board's initial inquiry pursuant to the Rules of Supreme Court for Disciplinary Control of Judges (hereinafter R.S.C.D.C.J.) 7(1), Attorney Ian P. Carleton was appointed to serve as Special Counsel to investigate the matter further. Attorney Carleton filed a formal complaint on June 27, 2016, alleging that Mr. Kane violated several Canons of the Vermont Code of Judicial Conduct. Mr. Kane retained Attorney Melvin Fink as his counsel and filed his answer on July 26, 2016. The Board held an evidentiary hearing on March 20-22, 2017.

## Canons Alleged to have been Violated

The complaint asserts that Mr. Kane violated Canons 1, 2A, 4A(2), and 5B(2) based on the following allegations:

He did not uphold the integrity of the Judiciary and participate in maintaining high standards of conduct as evidenced by:

1.      His collecting and depositing into his personal bank account certain payments on loans that were made with Ms. Tolaro's money, as well as his continued management of the loans, including negotiating the forgiveness of the remainder of the loans, even though he did not have legal authority to do so;

2.      His failure to provide entirely truthful testimony at a court hearing when he indicated that at least one of the loans was made with his money, even though it was actually Ms. Tolaro's money he used for the loans;

3.      His filing of a facially implausible claim against Ms. Tolaro's estate;

4.      His continued use of Ms. Tolaro's funds after her death to pay for the expenses of her Pleasant Street property, which he stood to inherit, until the estate administrator was compelled to seek an order by the Probate Division to turn over the funds and management because Mr. Kane did not do so after prior request.

(Canon 1)

He did not avoid impropriety in all of his activities and did not act at all times in a manner that promotes public confidence in the integrity of the Judiciary based upon the same factual allegations as the Canon 1 charge. (Canon 2).

He did not conduct his extra-judicial activities in such a way to avoid demeaning his judicial office based upon the same factual allegations as the Canon 1 charge. (Canon 4A(2)).

---

[1] At the beginning of the evidentiary hearing on this matter, the Board chair inquired as to how to refer to Mr. Kane during the proceedings and Mr. Kane's counsel stated that because Mr. Kane has tendered his resignation as an assistant judge, that referring to him as "Mr. Kane" would be appropriate. Accordingly, the Board refers to him as such in this report.

He did not maintain the dignity appropriate to a holder of judicial office and act in a manner consistent with the integrity of the Judiciary based upon the same factual allegations as the Canon 1 charge.  (Canon 5B(2)).

**Burden of Proof**

It is Special Counsel's burden to proof that Mr. Kane violated the alleged Canons by clear and convincing evidence.  R.S.C.D.C.J. 10(1); *Balivet*, 2014 VT 41, ¶ 20.  "Clear and convincing evidence is a 'very demanding' standard, requiring somewhat less than evidence beyond a reasonable doubt, but more than a preponderance of the evidence.  [It] does not require that evidence in support of a fact be uncontradicted, but does require that the fact's existence be 'highly probable.'"  *In re E.T.*, 2004 VT 111, ¶ 12, 177 Vt. 405 (citation omitted).

**Findings of Fact**

The following facts were established by clear and convincing evidence:

1.      Katherine "Kay" Tolaro is the wife of Paul Kane's uncle.  Mr. Kane knew Ms. Tolaro for approximately forty years before she died.  Mr. Kane and his late-wife Marie would visit Ms. Tolaro frequently at her home on Pleasant Street in Bellows Falls.

2.      In late 2009, Ms. Tolaro moved into Mr. Kane's home in Westminster.  She was 82 years old at the time.  There is conflicting evidence as to whether she was showing early signs of dementia at the time Ms. Tolaro moved in with the Kanes, or whether she was simply losing her hearing.

3.      Initially, Ms. Tolaro did not move into the Kane residence full-time.  She would sleep at their house and Mrs. Kane would return with Ms. Tolaro to the Pleasant Street home where Ms. Tolaro would attend to her personal needs such as cooking and bathing.  It was unclear at that time how long Ms. Tolaro would be staying with the Kanes.  According to Mr. Kane, Ms. Tolaro requested to sleep at his residence because she was afraid of being alone at night due to recent break-in attempts.

4.      On October 11, 2009, Ms. Tolaro executed a "Limited Power of Attorney For Finances," which granted Mr. Kane and his wife the ability to obtain financial information on her behalf.  The document was signed at the office of Ms. Tolaro's longtime attorney, Mike Harty.

5.      On December 3, 2009, Mr. Kane sent Attorney Harty an email requesting that Mrs. Kane be compensated for her time caring for Ms. Tolaro.  He did not mention that he was also caring for Ms. Tolaro.  He stated that Mrs. Kane had been providing services to Ms. Tolaro seven days a week for at least four hours a day.

6.      On December 6, 2009, Mr. Kane sent Attorney Harty another email, saying "[Ms. Tolaro] has been with [the Kanes] for the past 3 days."  Mr. Kane testified that this reference to the "past 3 days" indicated when Ms. Tolaro had moved in permanently with the Kanes.  This testimony is in conflict with other emails, discussed herein, as well as Mr. Kane's Statement Of Claim filed with the Probate Court, discussed below, in which he asserted that he had personally been providing Ms. Tolaro with 24/7 care since October 2009.

3

**7.** On January 7, 2010, Mr. Kane emailed Attorney Harty requesting that he arrange to have Mrs. Kane be Ms. Tolaro's POA because she was "having issues in helping [Ms. Tolaro] with finances." Mr. Kane was vague as to what he was specifically requesting. The 2009 limited POA had given Mrs. Kane and himself the authority to obtain financial information. The email acknowledged that they knew her financial information, but added "[Ms. Tolaro] needs to have some things done that are beyond her at this point." However, in the December 3, 2009 email, Mr. Kane stated he wanted Attorney Harty "to set up a withdrawal and dep from [Ms. Tolaro] to [Mrs. Kane] for payment of work." It is clear from the circumstantial evidence that this was his reason for requesting a more expansive POA.

**8.** Both Special Counsel and Mr. Kane agree that as of January 2010, Ms. Tolaro's net worth was approximately $767,500.

**9.** On February 5, 2010, Mr. Kane wrote a check for $60,000 made payable to himself from Ms. Tolaro's bank account. Ms. Tolaro signed the check. Mr. Kane described the check as a "gift." Mr. Kane testified at the evidentiary hearing that Ms. Tolaro initially wrote him a check for $100,000, but he refused to accept it because it was too much money. Mr. Kane testified that Ms. Tolaro tore up the check and wrote him a second check for $75,000, which he again refused and she again tore up. He testified that it was only after tearing up the second check that she gave him permission to write a third check, which he made out for $60,000. He claimed Mrs. Kane was the only other person present and that he did not report the $60,000 on his taxes because he had understood that gifts were not taxable. Special Counsel presented copies of Ms. Tolaro's check receipts proving that there were no missing checks preceding the $60,000 check. Moreover, there was only $45,000 in the one other bank account in which Ms. Tolaro had the ability to write checks. The Board finds that Mr. Kane did not provide truthful testimony as to the circumstances surrounding this $60,000 check.

**10.** On April 6, 2010, Ms. Tolaro executed a new Power of Attorney, naming Mr. and Mrs. Kane as her agents. However, this POA did not contain a provision that would allow the Kanes to authorize gifts to themselves.

**11.** That same day, April 6, 2010, Ms. Tolaro executed a new will. The will bequeathed the Pleasant Street property to the Kanes. It also indicated that certain money was to be given to four charities, with the remainder of the estate to be distributed to Mr. Kane, Ms. Tolaro's nephew, and two of Ms. Tolaro's friends. Mr. Kane testified that he brought Ms. Tolaro to Attorney Harty's office, but that he was not physically present for the execution of the will.

**12.** On August 18, 2010, Mr. Kane used his POA to purchase an annuity through People's United Bank from Jackson Annuity Co. (Jackson annuity) worth approximately $123,000. Mr. Kane named himself and Mrs. Kane as sole beneficiaries. Mr. Kane purchased the annuity after having two 60-90 minute meetings with Lynda Walker, a People's United employee.[2] Mr. Kane said he believed that by listing himself as beneficiary, it would enable him to withdraw funds from the annuity to pay for Ms. Tolaro's care while she was alive. He also claimed to be unaware, at the time, that it was his POA that would allow him to make the withdrawals, not his designation as the

---

[2] Mr. Kane explained that Ms. Tolaro was not present for the meetings because she had lost her hearing and could not read lips very well at that point.

beneficiary. He testified that he always understood that although he and his wife were listed as the beneficiaries, that the money was Ms. Tolaro's and would go to her estate after she died. Yet, despite this testimony Mr. Kane did not turn over the assets from the annuity when requested by the estate administrator until ordered to do so by the Probate Court.[3]

**13.** On October 19, 2010, Mr. Kane wrote a letter to Attorney Harty. In the letter, Mr. Kane said that Mrs. Kane had been taking care of Ms. Tolaro "for the past 6+ months." He stated that Mrs. Kane chose to take care of Ms. Tolaro, seven days a week, "out of family commitment and love." He wrote that Mrs. Kane was caring for Ms. Tolaro and did not mention that he was also providing care. In recognition of the amount of work this entailed, Mr. Kane asked that his wife be compensated going forward at a rate of $15 per hour. He also specified that he was not requesting that Mrs. Kane be compensated for "time spent with us and/or family time. We are talking about the feeding daily, cleaning, managing the house needs, concerns of the [apartment] dwellers, finances, etc." There was no evidence presented regarding Attorney Harty's response or any formal arrangement reached by Mrs. Kane and Attorney Harty, and Mr. Kane made no mention of himself as providing care.

**14.** In 2011, Mr. Kane entered into a verbal agreement to loan Mark Olbrych money to renovate a building which contained a bar. In 2005, Mr. Kane had sold the building to Mr. Olbrych, although he retained a mortgage on the building, which Mr. Olbrych continued to make monthly payments on at the time of the second loan. As to the 2011 loan, Mr. Kane represented to Mr. Olbrych that he would loan Mr. Olbrych his own money. However, on May 3, 2011, Mr. Kane used his POA to withdraw $30,000 from Ms. Tolaro's account, which he then signed over to Mr. Olbrych. Mr. Olbrych made out all his loan repayment checks to "Paul Kane Real Estate" or "Paul Kane." No paperwork accompanied the loan.

**15.** On May 11, 2011, Mr. Kane entered into a written agreement with David Carrier to loan Mr. Carrier money to purchase a mobile home. The two men knew each other through working for a mutual employer. The agreement stated that Mr. Kane was personally financing the loan, that Mr. Carrier would pay Mr. Kane a monthly repayment amount, and that Mr. Kane would hold the deed until the loan was repaid. However, that same day, Mr. Kane used his POA to withdraw $24,000 from Ms. Tolaro's account, which he transferred to Mr. Carrier.

**16.** On July 1, 2011, Mr. Kane withdrew another approximately $19,000 from one of Ms. Tolaro's bank accounts and transferred the money to Mr. Olbrych.

**17.** Mr. Kane testified that he had informed Ms. Tolaro of these loans and obtained her permission to loan Mr. Olbrych and Mr. Carrier this money as he believed it would give her a better rate of return than investing the money in other ways. The Board does not find this claim to be credible because he consistently represented to everyone that the loans were made from his personal funds.

---

[3] Mr. Kane testified that he was unsure whether he or Ms. Walker suggested putting himself as a beneficiary. Ms. Walker categorically denied advising Mr. Kane to list him and his wife as the beneficiaries. She further testified that Mr. Kane instructed her to list himself and his wife as the beneficiaries. Based on this testimony, the Board does not find Mr. Kane's testimony credible that he had mistakenly believed he needed to be the beneficiary in order to withdraw funds from the annuity in order to provide for Ms. Tolaro's care while she was still alive.

18. On February 14, 2012, Mr. Kane used his POA to purchase an annuity through People's United Bank from Great American Insurance Company (Great American annuity) worth approximately $144,000. As with the Jackson annuity, Mr. Kane listed himself and his wife as the sole beneficiaries. Mr. Kane testified that he always understood that, although he and his wife were listed as the beneficiaries, the money was Ms. Tolaro's and would go to her estate after she died. As part of the annuity application, Mr. Kane indicated he was using his POA because Ms. Tolaro "is not able to conduct his/her own business due to mental disability." This indication is in conflict with Mr. Kane's testimony at the evidentiary hearing that Ms. Tolaro was mentally sound when he purchased the annuities.

19. In April 2012, Mrs. Kane was diagnosed with Stage 4 cancer.

20. On May 3, 2012, Mr. Kane filled out an application for Ms. Tolaro to live at the Ascutney House, a new residential care facility.

21. In June 2012, Mrs. Kane passed away. Shortly thereafter, Mr. Kane placed Ms. Tolaro in the Ascutney House.

22. In March 2014, Mr. Olbrych informed Mr. Kane that he could no longer afford to make payments on the 2005 loan. The parties reached an oral agreement that Mr. Olbrych would stop paying the 2005 loan, but continue to make payments on the 2011 loan.

23. Also in March 2014, Mr. Carrier ceased making payments on his loan. Mr. Kane testified that he had only deposited Mr. Carrier's payments into the -4018 account, which had originally been Ms. Tolaro's own banking account. At some point, Mr. Kane had been added to the account, making it a joint account. However, upon Ms. Tolaro's death, the account became Mr. Kane's sole account. Mr. Kane testified that, even after Ms. Tolaro's death, he considered the account to contain Ms. Tolaro's and her estate's money.

24. On April 7, 2014, Mr. Kane submitted an Extended Care Benefit Request seeking to liquidate some of the Jackson annuity to pay for Mr. Tolaro's care.

25. On April 21, 2014, Ms. Tolaro died.

26. On May 6, 2014, Great American wrote a letter expressing its concern with distributing the annuity to Mr. Kane due to a potential conflict of interest arising from the fact that Mr. Kane had purchased the annuity as Ms. Tolaro's POA and he was the beneficiary. Great American informed Mr. Kane that it would "require the consent of all interested parties who may have a claim if this designation [as beneficiary] were found to be invalid."

27. On May 27, 2014, Mr. Kane deposited $64,169.10 into his personal checking account ending in -6088. This was the money remaining from the Jackson annuity. Mr. Kane originally testified that he deposited the money into the -4018 account. However, a bank statement from Mr. Kane's -6088 account demonstrates this to be untrue. After being confronted with his bank statement, Mr. Kane testified that he transferred the money from -6088 to the -4018 account in October 2014. He did not provide any documentation supporting this claim that the money was actually transferred to the -4018 account, an account that remained in his name, not the estate's.

28. On July 3, 2014, Mr. Kane filed a petition in the Probate Division to open Ms. Tolaro's estate. He indicated that his own attorney, Christopher Moore, would serve as the

estate administrator. Eventually, Attorney Moore was appointed estate administrator. However, he continued to serve as Mr. Kane's attorney.

29.     In July or August 2014, the parties agree that Mr. Kane became a candidate for assistant judge. During this time period, he collected signatures, told people that he was running for assistant judge, submitted a letter to the editor announcing his candidacy, and filed paperwork formally making him a candidate for the position.

30.     Sometime after Ms. Tolaro moved in with him, Mr. Kane began managing the apartment attached to her Pleasant Street property. Mr. Kane testified at the evidentiary hearing that after Ms. Tolaro's death, he would put the rent money into the -4018 account. Mr. Kane testified that after Attorney Moore was appointed as the estate administrator, Attorney Moore never asked about the rent money and that he had Attorney Moore's permission to use the money from the Jackson annuity to pay the costs associated with the Pleasant Street property. Attorney Moore credibly testified that he gave Mr. Kane permission to pay the expenses for the property, but only because he was under the impression that there were no assets of the estate with which the estate could use to pay for the Pleasant Street property's carrying costs. Attorney Moore further credibly testified that he was unaware that Mr. Kane had been using the proceeds of the Jackson annuity to pay for these expenses because Attorney Moore did not learn of the existence of the Jackson annuity until the spring of 2015. Therefore, it was impossible for him to advise Mr. Kane to keep the Jackson annuity proceeds and use them to pay the Pleasant Street expenses.

31.     In October 2014, Mr. Olbrych informed Mr. Kane that he could no longer afford to make payments on the 2011 loan. On October 14, 2014, Mr. Kane sent a letter stating Mr. Olbrych still owed $17,473 on the 2011 loan, which would rise to $19,332 if Mr. Olbrych paid in monthly installments. The letter noted that Mr. Olbrych still owed $166,075.57 on the 2005 loan. Mr. Kane suggested four options, the last of which was that Mr. Olbrych could return the property to Mr. Kane. According to Mr. Kane, this was an acceptable option to him because: "[he] can make money on it as [he] owe[d] nothing and/or [he] could sell at a very low price."

32.     In either November or December 2014, Mr. Kane and Mr. Olbrych reached an oral agreement that would go into effect on January 1, 2015. Under the terms of this agreement, Mr. Kane forgave the remaining eleven payments of $996.36 ($10,959.96 total) from the 2011 loan in exchange for Mr. Olbrych deeding the newly renovated property back to Mr. Kane. As noted above, Mr. Kane had previously loaned Ms. Tolaro's money to Mr. Olbrych to finance the renovations. Mr. Kane did not obtain authorization from Ms. Tolaro's estate administrator to forgive the loan. Mr. Kane testified that he reached this agreement because he did not know how to collect the debt.

33.     Throughout the duration of the Olbrych loan, Mr. Kane deposited the loan payments into at least two different accounts. Mr. Kane estimated that Mr. Olbrych made approximately forty payments of $996.36 on the 2011 loan. Of those forty payments, Mr. Kane stated that he had deposited thirty of them in the -4018 account. Mr. Kane also deposited ten payments, worth approximately $9,800, into his own personal bank account. Mr. Kane stated this money was to reimburse himself for expenses associated with maintaining the Pleasant Street property which he stood to inherit, including repairing the roof, a leak from the porch, window frames, and replacing the furnace. These were different expenses than those he reimbursed himself with the Jackson annuity funds. Mr. Kane is unsure how long he continued the practice of reimbursing himself, but estimates

7

he did so until either later 2014 or 2015, when it is undisputed that he was subject to the Code of Judicial Conduct.

34.     On November 14, 2014, Mr. Kane sent an email to Mr. Carrier to inform him that his failure to make payments on the loan since March 2014 was unacceptable.  He also wanted to know who was going to pay the taxes for the mobile home.  In the email, Mr. Kane wrote: "You must have a credit rating that sucks and I am sure you owe others.  How do you feel so entitled.  Why should I be paying for your home?  You are working and getting a monthly check from the army….NO SHAME I guess."

35.     On November 19, 2014, Mr. Kane sent another email to Mr. Carrier stating that Mr. Carrier's check had bounced and that the mobile home could not be sold in its current condition.  He concluded his email, saying: "I do not get it …But you have to live with yourself and i [sic] guess it is just in your DNA.  This will catch up with you at some point.  Remember bouncing checks is a crime and if Charlestown wanted to …they could prosecute.  I am sure you have floated others.  Would it be cool or what if you were to do time in [Sullivan] County jail."  At the evidentiary hearing, Mr. Kane acknowledged that the contents of this email were inappropriate.

36.     On December 14, 2014, Attorney Moore requested to withdraw as the estate administrator, citing a conflict of interest.

37.     On March 4, 2015, Attorney Jodi French was appointed the new estate administrator.

38.     On March 5, 2015, Mr. Carrier's mobile home was sold.  Mr. Kane was listed as a seller of the mobile home, along with Mr. Carrier.  Mr. Kane signed the Warranty Deed and an Agreement for Net Proceeds stating that he was the owner of the property.  He also signed a New Hampshire Department of Revenue Administration form and a HUD settlement statement form indicating that he was an owner of the property.  Pursuant to this transaction, Mr. Kane received $10,000 in cash.[4]  Although Mr. Kane testified the money was actually the property of Ms. Tolaro's estate, Mr. Kane placed the cash in a safe deposit box.  Mr. Kane testified he put the cash in a safe deposit box because he did not know where else to place the money despite knowing the estate had an administrator and despite testifying he believed the money was Ms. Tolaro's.  The Board finds his explanation to be not credible.

39.     Also on March 5, 2015, as a result of the sale of the mobile home, Mr. Kane forgave Mr. Carrier's outstanding loan payments.  Mr. Kane did not obtain authorization from Ms. Tolaro's estate administrator to forgive the loan.

40.     On March 24, 2015, Attorney French sent Attorney Moore an email requesting more information regarding the Pleasant Street property, particularly as it related to the rental of the property.  Attorney French asked him whether Mr. Kane would like to mail her the rent checks and pay for the bills, but added that it was acceptable for Mr. Kane to continue to handle the property management and bill paying so long as there was adequate documentation of the accounting.  Mr. Kane testified that he took this email as approval for him to continue spending Ms. Tolaro's money to pay for the expenses.  Attorney French

---

[4]  Mr. Kane claims this figure allowed him to recoup the remainder of the $24,000 principal and some of the interest owed.  There was insufficient evidence to determine the accuracy of this claim.

credibly testified that, at the time of this email, she was under the impression that Mr. Kane was personally advancing the estate money to pay the Pleasant Street expenses. Attorney French credibly explained that she was amendable to Mr. Kane managing the property and paying the expenses only because she was under the impression that the estate could not afford to pay the bills and she did not want to lose the property. Mr. Kane later mentioned to Attorney French that he was paying the expenses from money he received from the Jackson annuity in a meeting in April 2015, but because it was not in Attorney Moore's file, Attorney French was unaware that the Jackson annuity proceeds were assets of the estate.

41. Attorney Moore also credibly testified that it was around this time when he first became aware of the existence of the Jackson annuity.

42. The Board finds that Mr. Kane's interactions with Attorney Moore and Attorney French regarding the Pleasant Street property and the potential assets to pay for those expenses were at best misleading and self-serving.

43. Also in the March 24, 2015 email, Attorney French requested Mr. Kane turn over the proceeds from the Great American annuity. Attorney Moore refused, stating he was researching whether he could pursue a claim against People's United for selling the annuity in the first place. Mr. Kane eventually turned over the Great American annuity proceeds months later. Attorney French also asked for various other information so that she could examine the evolution of Ms. Tolaro's finances. Attorney Moore and Mr. Kane failed to provide her with the appropriate documentation. Ultimately, Attorney French was able to obtain the statements from the banks. In general, Attorney French found it difficult to obtain clear information and documentation from Mr. Kane through his attorney.

44. On April 27, 2015, Mr. Kane mailed Attorney French a letter with rent checks made payable to Mr. Kane personally. The letter informed Attorney French of the existence of the Olbrych and Carrier loans for the first time. Based on the letter, Attorney French was led to believe that the loans were using Mr. Kane's funds and that he had been comingling his assets with the estate's assets.

45. On May 29, 2015, Attorney French sent Attorney Moore a letter requesting that all assets of the estate held by Mr. Kane, which included the Jackson and Great American annuities, be turned over to her. She also listed specific information that she was requesting on behalf of the estate, including a reference to the Carrier loan. Mr. Kane did not fully comply with the request to turn over the assets until ordered by the Probate Division a year later.

46. In response to this letter, Attorney Moore asked Mr. Kane about the Olbrych and Carrier loans. Mr. Kane told Attorney Moore he had used his own money for the Olbrych loan. Accordingly, Attorney Moore responded to Attorney French conveying this incorrect information. The Board notes Mr. Kane repeatedly testified the money belonged to Ms. Tolaro.

47. On June 30, 2015, Attorney French sent another letter updating Mr. Kane through Attorney Moore on her progress. Attorney French stated that she had calculated Ms. Tolaro's net worth at approximately $767,500 as of January 2010. The letter also mentioned both the Carrier and Olbrych loans. Attorney French advised Mr. Kane of his right to file a claim against the estate for serviced rendered during Ms. Tolaro's lifetime, but expected it to be fully supported with appropriate documentation.

**48.** Based on the reference to the Olbrych and Carrier loans, Attorney Moore followed up with Mr. Kane. Mr. Kane initially stated the money came from his wife's savings and then stated he could have sworn the money came from his personal funds. At this time, it was still not communicated to Attorney French that Mr. Kane had received and possessed the $10,000 cash from the sale of the mobile home.

**49.** On July 2, 2015, Mr. Kane sent an email to the assistant of Attorney Moore, who was still Mr. Kane's attorney, although no longer the estate administrator. Mr. Kane asserted he was owed for various expenses, the sum of which he estimated would roughly approximate how much Attorney French estimated Ms. Tolaro's total assets had been worth in 2009. He added that he could include more costs "that would bring us close to or over [the approximately $700,000] assessment" of the value of Ms. Tolaro's assets in 2009. Mr. Kane testified at the evidentiary hearing that he was not attempting to establish a claim that would match the assets in the estate. The Board does not find this claim to be credible.

**50.** On July 31, 2015, Mr. Kane submitted a statement of claim for $833,292.51. The vast majority of this claim, $772,740, was made up of the 159 hours per week that he alleged both he and Mrs. Kane "were caring for and available to" Ms. Tolaro. Mr. Kane claimed that both he and his wife worked "around the clock," i.e. for 24 hours per day, seven days a week, less nine hours of respite care, for 135 weeks between November 2009 and April 2012 [despite previously emailing Attorney Harty on Dec. 3, 2009 and Oct. 19, 2010 that his wife was providing care]. He set their hourly rate at $18 per hour despite previously requesting from attorney Harty on Oct. 19, 2010 on behalf of his wife $15 an hour. Mr. Kane also listed $7,800 due for his financial and property management. This sum was calculated at five hours per week at $15 per hour for 104 weeks. At the evidentiary hearing, Mr. Kane acknowledged that it was a mistake to make a claim for the management work at the same time he was requesting reimbursement for the 24/7 care coverage. He admitted that he did not review the underlying calculations closely enough. However, the Board finds that this total largely reflects the figures Mr. Kane provided to Attorney Moore's assistant on July 2, 2015, and therefore he was actually aware of the underlying basis for the submitted claim.

**51.** In addition to the $772,740, Mr. Kane also claimed $20,925 for room and board, calculated at $675 per month. Finally, Mr. Kane listed $31,827.51 for expenses advanced to the estate by Mr. Kane between April 21, 2012 to July 31, 2015.

**52.** Mr. Kane testified that Attorney Moore's assistant was responsible for calculating these figures based on information he had given her. Attorney Moore testified that Mr. Kane had said multiple times that the Kanes had provided 24/7 care to Ms. Tolaro before she was placed in Ascutney House and that he had quit his job to care for her.

**53.** On August 26, 2015, Attorney French disallowed Mr. Kane's claim for $833,292.51.

**54.** In August or September 2015, Attorney Melvin Fink, replaced Attorney Moore as Mr. Kane's personal attorney.

**55.** On September 10, 2015, Attorney Fink appealed the disallowance of the claim to the Probate Division.

**56.** At a November 5, 2015 probate hearing, in which Mr. Kane was required to attend pursuant to a subpoena, Mr. Kane for the first time revealed to Attorney French that he had

sold the Carrier mobile home and received $10,000 in cash. During the hearing, Mr. Kane indicated that he had supplied his own money to finance the Olbrych and Carrier loans.

57.     At the evidentiary hearing before the Board, Mr. Kane submitted into evidence a letter he purportedly sent to Attorney French on November 20, 2015. In the letter, Mr. Kane said he had "misspoke" when he had testified at the Probate Hearing that the funds used in the Olbrych and Carrier loans were his and that he wished to "clarif[y]" that the money was Ms. Tolaro's. Attorney French credibly testified that she had never received the letter. The court finds that this letter was never sent to Attorney French. However, even if it had been sent to Attorney French, it is undisputed that the letter was not sent to the Probate Division and that Mr. Kane never informed the court that he had given false testimony while under oath.

58.     By January 2016, Mr. Kane had turned over the Pleasant Street monthly rent, the $1,500 rebate from the Ascutney House, and the proceeds from the Great American annuity. However, Mr. Kane did not turn over the proceeds from Jackson annuity or the Carrier or Olbrych loans.

59.     On March 9, 2016, Mr. Kane directed Attorney Fink to send Attorney French a letter regarding certain payments he had continued to make on the estate's behalf for the Pleasant Street property. Attorney French responded to the content of Mr. Kane's letter at a hearing in the Probate Division, indicating that Mr. Kane needed to turn over all assets of the estate. Following the hearing, Mr. Kane did not immediately turn over the remaining assets of the estate.

60.     On May 24, 2016, the Probate Division issued an order that Mr. Kane turn over to Attorney French the following assets: $16,400, representing the balance of the -4018 account after the deduction for funeral expenses; $18,000, which the court described as Mr. Kane's representation of all that remained of the Jackson annuity;[5] $11,790 from the Carrier loan; $1,265 related to the Carrier loan; $7,733.12 from the Olbrych 2011 loan; and the Pleasant Street property. The court specifically noted that Attorney French had the right to challenge Mr. Kane's use of the Jackson annuity proceeds, which he claimed he spent on estate expenses. As to the loans, Attorney French was forced to prove through the introduction of admissible documents, that Mr. Kane had received each payment. This forced her to look through bank statements because Mr. Kane had provided her with incomplete or inaccurate records. Attorney French was also forced to recreate an accurate accounting of the -4018 account in order to determine what were estate funds and what were Mr. Kane's funds at the date of Ms. Tolaro's death. Attorney French also had to ask the Court to order Mr. Kane to turn over all estate assets in his possession because he had not yet done so after her prior request.

61.     Following this order, Mr. Kane finally turned over the requested assets of Ms. Tolaro's estate.

62.     On September 13, 2016, Mr. Kane submitted an amended Statement of Claim. In the motion to permit the amendment, Mr. Kane explained that the original claim included the time both himself and his wife had spent caring for Ms. Tolaro when it should have

---

[5] It is unclear to the Board how Mr. Kane arrived at this $18,000 figure. Mr. Kane testified that he received $64,169.10 from Jackson. He further testified that he had spent $31,827.51 from these funds. This would leave a remainder of $32,341.59, not $18,000.

only included the time Mr. Kane spent caring for Ms. Tolaro, not his wife.[6] However, rather than dividing the personal care fee of $772,740 in half, he divided the entire $833.292.51. This meant that he was still including in his claim approximately $3,900 for financial and property maintenance, even though this work was performed during the same 159 hours per week he was claiming that he cared for Ms. Tolaro. Further, by simply dividing the $833,292.51 in half, it reduced the total Mr. Kane was claiming for room and board, without explanation. Moreover, the amended claim still included the $31,827.51 for expenses he said were advanced to the estate out of the proceeds from the Jackson annuity, which he claimed was property of the estate and he had already received pursuant to the May 24, 2016 Probate Division order. Mr. Kane acknowledged in his testimony before the Board that he should have not included any of the $31,827.51 in either his original or amended claim. Despite these inaccuracies, Mr. Kane admitted he had reviewed and approved the amended statement of claim that his attorney submitted on his behalf. Mr. Kane also confirmed that although he has been aware of some of these ongoing inaccuracies, he has not alerted the court of these inaccuracies or filed a motion to further amend his Amended Statement of Claim.

**63.** Beyond the above-noted problem with how Mr. Kane calculated his amended claim, the Board also finds that the claims for the 24/7 care provided were facially implausible. Mr. Kane calculated that he, in addition to his wife, was providing 24/7 care, less nine hours, from November 2009 to April 2012. At the hearing, Mr. Kane would only admit that it was a mistake for him to submit a claim for both his wife's 24/7 care of Ms. Tolaro in addition to his 24/7 care of Ms. Tolaro. However, the Board finds that Mr. Kane's claim has more fundamental flaws. For instance, Mr. Kane was working a full-time job during part of the period of time he claims he was providing 24/7 care to Ms. Tolaro. Moreover, his ongoing claim that he was providing any care for this entire period is contradicted by his emails on December 3, 2009, January 7, 2010, and October 19, 2010, in which he indicated that Mrs. Kane was the sole person taking care of Ms. Tolaro. Mr. Kane also did not acknowledge in either his original or amended claim that he had already received $60,000 from Ms. Tolaro in February 2010, approximately one month after asking Ms. Tolaro's attorney that Mrs. Kane receive compensation for her services or that in October 2010 he had only requested that going forward Mrs. Kane, not himself, be compensated for a limited amount of work, as opposed to 24/7 care.

**64.** On October 17, 2016, the Probate Division issued an opinion denying Mr. Kane's request to decree that the Pleasant Street property be his. The order also granted Attorney French's request to rent the apartment attached to Ms. Tolaro's former home and ordered Mr. Kane to remove all his personal property from the home within two weeks.[7]

---

[6] Mr. Kane testified that he realized this mistake in October 2015. He did not provide an explanation for why he failed to submit an amendment for nearly a year after he realized his claim contained erroneous information.

[7] In making its rulings, the Probate Division made findings of fact that would be relevant to the Board's review of this matter. Although not explicit, it appears the court made its findings based on a preponderance of the evidence. Thus, because the standard of proof was lower in the prior matter, the Board may not adopt the Probate Division's findings. See *In re J.R.*, 164 Vt. 267, 270 (1995) ("Our cases as far back as 1862 hold that verdicts resting on a lower burden of proof should not be conclusive in subsequent actions requiring a more stringent burden of proof."). Mr. Kane appealed this decision to the civil division. However, between the evidentiary hearing on

12

**65.** At the hearing, Mr. Kane testified that he had submitted letters of resignation regarding his position as assistant judge. He explained that he took this action because he did not want to taint the Judiciary with the *perception* that he had been engaged in any wrongdoing. However, he denied that he had depleted Ms. Tolaro's estate because he said he had given Attorney French approximately $450,000 in assets. Mr. Kane gave no response when Special Counsel pointed out to him that he had only turned over these assets pursuant to a court order issued a year after Attorney French had requested the assets. The Board finds that Mr. Kane's explanation for why he was resigning demonstrates a failure to take responsibility for his conduct.

**66.** As noted throughout these findings, the Board found much of Mr. Kane's testimony to lack credibility. In sum, the Board finds the following areas specifically significant in weighing Mr. Kane's credibility:

(1) His testimony that he originally thought being designated as the beneficiary meant that he would be allowed to withdraw money from Ms. Tolaro's annuities during her life;

(2) His testimony suggesting that Lynda Walker recommended that he list himself as the beneficiary for the annuities, which was directly contradicted by Ms. Walker's credible testimony;

(3) His testimony that he did not believe Ms. Tolaro was incompetent at the time he purchased the annuities on her behalf, which was directly contradicted by his indication on the Great American application that he was signing as her POA due to her mental disability; and

(4) His claim that he wrote the $60,000 check after Ms. Tolaro filled out and ripped up two checks for $100,000 and $75,000, which was directly contradicted by Ms. Tolaro's bank statements indicating that there was no missing checks in sequence prior to the $60,000 check.

### Jurisdiction

The Board retains jurisdiction over the allegations alleged in this complaint despite Mr. Kane statement that he has resigned from his judicial office. See R.S.C.D.C.J. 3(1) ("The Board has continuing jurisdiction over former judges regarding allegations that misconduct occurred during their judicial service if a complaint is made within three years of the discovery of the grounds for the complaint."). Moreover, as the parties agree and the Board finds, Canon 5 makes clear that the Code of Judicial Conduct becomes applicable once a person declares his or her candidacy for the assistant judge position. See Canon 5C, 5B, Terminology [2]. Therefore, the Board retains jurisdiction over Mr. Kane's activities between July or August 2014 and the evidentiary hearing held on March 20-22, 2017.

### Findings on Alleged Canon Violations

The alleged violations of Canons 1, 2A, 4A(2), and 5B(2) are based on the same factual allegations regarding the Olbrych and Carrier loans, including his testimony at the November 5,

---

this matter and the issuance of this disposition report, the civil division dismissed Mr. Kane's appeal. See *Kane v. Estate of Tolaro*, No. 523-11-16 Wrcv (Vt. Super. Ct. Mar. 27, 2017) (Gerety, J.).

2015 probate hearing, his original and amended statement of claim, the handling of the Jackson and Great American annuities, and the handling of the Pleasant Street property.

In order to find a violation of the Code of Judicial Conduct as to these allegations, the Board must concluded that Mr. Kane's conduct was intentional, not merely a mistake. *In re Kroger*, 167 Vt. 1, 7 (1997). "Intent can, of course, be inferred from the evidence. For example, if the evidence shows that a judge had personal knowledge of facts contrary to the judge's statement, the judge's intent to deceive may be inferred." *Id.* at 7 n.2. In finding a violation of the Code, it is unnecessary to determine if the judge acted with bad faith or evil intent. *Id.* at 6. Similarly, it is irrelevant "whether [the judge] realized any tangible personal benefit or pecuniary gain from the transaction." *In re Boardman*, 2009 VT 42, ¶ 15, 186 Vt. 176.

*Olbrych and Carrier Loans*

The evidence established that between July and October 2014, when Mr. Kane was subject to the Code, he deposited Mr. Olbrych's loan payments into accounts that were his sole property, regardless of whether the money was deposited into the -4018 account or -6088 account. Moreover, Mr. Kane had Mr. Olbrych make the checks payable to "Paul Kane," including during the time period when Mr. Kane was subject to the Code, even though Mr. Kane knew that the money loaned to Mr. Olbrych was Ms. Tolaro's money. Also, rather than being forthcoming with Attorney French, Mr. Kane made Attorney French go through his bank records and prove at an evidentiary hearing that he had wrongly received certain payments from Mr. Olbrych.

The evidence further establishes that Mr. Kane did not inform Attorney Moore, as administrator of Ms. Tolaro's estate, of the Olbrych and Carrier loans shortly after the estate was opened in July 2014. Between October and December 2014, Mr. Kane intentionally negotiated the terms of Mr. Olbrych's release from the 2011 loan, such that it required Mr. Olbrych to transfer the property to Mr. Kane. Mr. Kane made this agreement even though he knew that the debt on the 2011 loan was owed to Ms. Tolaro's estate, not him, and that he would be benefiting from the improvements made to the property in connection with the 2011 loan. There was no evidence that Mr. Kane ever attempted to reimburse Ms. Tolaro's estate for the benefit he received when Mr. Olbrych gave him the property.

As to the Carrier loan, Mr. Kane intentionally conducted the sale of the mobile home, alleging on multiple official documents that he was the owner of the mobile home when he knew that it was Ms. Tolaro's funds, not his, that had financed the loan. Moreover, he conducted this sale one day after Attorney French had been assigned the new estate administrator. He intentionally did not inform her of the sale, or the fact that he had put $10,000 in cash, Ms. Tolaro's proceeds from the settlement, into his personal safety deposit box, and he intentionally did not reveal or turn those funds over when initially requested by Attorney French.

Mr. Kane intentionally misled both Attorney Moore and Attorney French as to the truth about the origin of the funds of both the Carrier and Olbrych loans for months. He knew those loans were from Ms. Tolaro's accounts and testified he considered those loans assets of Ms. Tolaro [hence her estate] yet he intentionally misled Attorneys Moore and French on the ownership of those funds and he intentionally forgave those loans without authority to do so. It was not until Mr. Kane was forced to testify at the November 5, 2015 hearing that Attorney French even became aware of the existence of the $10,000. Moreover, as the evidence of his misuse of Ms. Tolaro's money mounted, Mr. Kane continued to offer intentionally misleading testimony. Even though Mr. Kane knew that the money, particularly the $10,000, was the property of Ms. Tolaro's estate, he intentionally refused to surrender it to the estate administrator, who had specifically requested

that he turn over all estate assets on May 29, 2015, until ordered after he was ordered by the court to do so on May 24, 2016.

Based on this evidence alone, it is established by clear and convincing evidence that Mr. Kane violated Canon 1 ("A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved."); Canon 2A ("A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."); 4A(2) ("A judge shall conduct all of the judge's extra-judicial activities so that they do not … demean the judicial office"); and 5B(2) ("[I]f a candidate for initial appointment to state judicial office, shall maintain the dignity appropriate to judicial office and act in a manner consistent with the integrity and independence of the judiciary.").[8]

Specifically, Mr. Kane's treatment of the loan repayments as his own, his lack of forthrightness with the estate administrators, his intentional misleading of attorneys Moore and French, and his hiding and withholding of the $10,000 all demonstrate that Mr. Kane failed to observe high standards of conduct such that his actions diminished the integrity of the Judiciary. Further, his intentionally misleading testimony at the November 5, 2015 hearing demonstrated a failure to act in such a way to promote public confidence in the integrity of the Judiciary. In fact, his continued failure to inform the court that he had given intentionally misleading testimony demonstrates a continuing failure to observe the high standards of personal conduct and a continuing failure to act in a way that promotes public confidence in the integrity of the Judiciary. Taken as a whole, Mr. Kane's treatment of these loans during the time in which he was a candidate for, and holder of, the office of assistant judge demeaned the judicial office.

*Statement of Claim*

It was established by clear and convincing evidence that Mr. Kane intentionally filed a facially implausible claim. The circumstances demonstrate Mr. Kane's conduct was intentional for several reasons. First, he claimed that he was providing services to Ms. Tolaro 159 hours out of 169 hours in a week, for 135 weeks, despite the fact that he had a full-time job and had previously indicated in emails that only Mrs. Kane was providing care for Ms. Tolaro. Second, even if the 159 hours was an accurate weekly estimate, the claim still attempted to double-charge the estate for his alleged services rendered by also claiming he was owed for management services provided five hours per week for 104 weeks. Third, the claim included a request to be reimbursed $31,827.51, which he had already received from the Jackson annuity. Fourth, the claim included the 159 hours of care for both himself and his wife, even though his wife was deceased and her estate was closed. Mr. Kane reviewed these figures and still signed the statement of claim.

Even if the Board where to find that these errors were mistakes, which the Board does not so find, it is undisputed that most of these errors have not been brought to the attention of the Probate and Civil Court, even though he filed an amended claim, and despite the fact that it has been months since Mr. Kane became aware of these errors.

Based on this evidence, it is established by clear and convincing evidence that Mr. Kane violated Canons 1, 2A, 4A(2), and 5B(2). Mr. Kane filed both the original and amended claims while he was subject to the Code. Moreover, he has completely failed to correct these blatant errors, with the exception that it took him over a year to file the amended claim indicating it was a mistake for him to file a claim for his wife's services. By intentionally filing such facially implausible documents and failing to correct blatant errors, Mr. Kane has failed to observe the

_____

[8] Canon 5B(2) is applicable to assistant judges pursuant to Canon 5C(1).

high standards of conduct such that his actions diminished the integrity of the Judiciary and demeaned the judicial office which he held. Contrary to Mr. Kane's attorney's suggestion, a statement of claim is not a mere "*ad damnum*" clause.[9] To the extent that Mr. Kane had a valid claim for compensation for services rendered and expenses advanced, his conduct connected to this claim failed to promote public confidence in the integrity of the judiciary.

*Annuities and Pleasant Street Property*

It was established by clear and convincing evidence that Mr. Kane failed to protect Ms. Tolaro's assets in the Jackson and Great American annuities during the time he was subject to the Code. It is not the Board's responsibility to determine the propriety of Mr. Kane using his POA to take out the annuities and list himself as the beneficiary; that conduct occurred before he became subject to the Code. However, to the extent that Mr. Kane believed the proceeds of the annuities belonged to Ms. Tolaro's estate, as he testified to the Board, he was obligated to provide the proceeds to the estate. Instead, he kept the Jackson annuity proceeds in his personal checking account between July and October 2014, when he was subject to the Code.

Moreover, Mr. Kane intentionally mislead attorneys Moore and French for months by not disclosing the existence of the Jackson annuity and that he was using those proceeds from the annuity to pay for expenses, repairs, and potentially upgrades connected to the Pleasant Street property, which he knew he stood to inherit under Ms. Tolaro's will. And even though he continued to knowingly use Ms. Tolaro's funds to pay these expenses, he intentionally failed to keep or disclose accurate records of his expenditures, such that it has been hard or impossible for Attorney French to determine which expenditures should be reimbursed. Mr. Kane stressed that he was authorized by both administrators to continue using the Jackson funds to pay for the expenses. However, he never disclosed he had those founds. The point is not whether he was authorized to do so or not, rather, the intentionally deceptive nature of his actions impugned the integrity of the Judiciary and demeaned the judicial office.

Attorney French requested Mr. Kane turn over all assets of the estate, which would include the proceeds of the annuity, as early as March 24, 2015, and again on May 29, 2015. However, Mr. Kane refused to turn over the proceeds to Attorney French for many months. This refusal to promptly turn over the asset, even though Mr. Kane himself considered it estate property, demonstrates that Mr. Kane failed to meet the high standard of integrity expected of judges and did not ensure public confidence in the Judiciary.

Accordingly, it is established by clear and convincing evidence that Mr. Kane violated Canons 1, 2A, 4A(2), and 5B(2).[10]

**Sanctions**

---

[9] An "*ad damnum*" clause is a demand clause.

[10] During the course of Special Counsel's investigation, Mr. Kane's November 14 and 19, 2014 emails to Mr. Carrier were discovered. These emails were presented at the evidentiary hearing. Mr. Kane acknowledged his comment – that it would be "cool" if Mr. Carrier was incarcerated for failing to pay back the loan – was inappropriate. Although it was not included in the formal complaint, and therefore the Board does not consider it for purposes of sanctions, the Board believes it is necessary to state that such a comment, by a person who had been elected to judicial office days prior, is completely unacceptable. Mr. Kane, in sending this email, failed to maintain the high standard of conduct expected of individuals subject to the Code.

16

Special Counsel seeks sanctions to the fullest extent of the Board's authority. He asserts that this can include an immediate suspension, a public reprimand, and the barring of Mr. Kane from serving as a judge for life. Mr. Kane contends that his resignation and a public reprimand briefly stating the violations of the Canons is sufficient.

In the Board's unanimous[11] judgment, the appropriate sanction for Paul Kane's violation of Canons 1, 2A, 4A(2), and 5B(2) is the immediate and indefinite suspension from judicial office, a public reprimand, and a prohibition on his ever holding judicial office in Vermont. Although Mr. Kane and Attorney Fink represented that he has submitted his resignation to several officials, they did not provide the Board with proof that Mr. Kane had actually resigned. Therefore, an immediate suspension is appropriate. Moreover, because a formal complaint was filed, a public reprimand is required. See *In re Balivet*, 2014 VT 41, ¶¶ 31-41, 196 Vt. 425. Finally, the Board considers the permanent prohibition on holding judicial office appropriate due to the severity of Mr. Kane's conduct, the fact that these violations continued throughout his tenure as assistant judge, his refusal to take responsibility for his actions in his testimony before the Board, and his multiple instances of providing demonstrably false testimony to the Board at the hearing. The Board concludes that these three sanctions are necessary to accomplish the purpose of judicial discipline, that is to "protect the public, ensure the evenhanded administration of justice, and preserve and enhance public confidence in the integrity and fairness of the justice system." *Id.* ¶ 39 (quoting *In re O'Dea*, 159 Vt. 590 (1993)).

## PUBLIC REPRIMAND

Paul Kane is hereby publicly reprimanded for violating Canons 1, 2A, 4A(2), and 5B(2) of the Vermont Code of Judicial Conduct.

From the date this Order becomes final, and as further detailed in the Disposition Report of the Judicial Conduct Board dated April 24, 2017, Mr. Kane shall be immediately and indefinitely suspended from the office of assistant judge and shall be prohibited from holding any judicial office in the State of Vermont in the future.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

☒ Publish

_____
Marilyn S. Skoglund, Associate Justice

☐ Do Not Publish

_____
Harold E. Eaton, Jr., Associate Justice

_____
Beth Robinson, Associate Justice

---

[11] The entire Board except Judge David Howard was present for the hearing. Judge Howard was taken ill and unable to attend the full hearing and therefore recused himself.